UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

DARK STORM INDUSTRIES LLC, BRIAN DOHERTY,
and KEVIN SCHMUCKER,

*Plaintiffs*,

-against-

ANDREW M. CUOMO, in his official capacity as Governor
of the State of New York, EMPIRE STATE
DEVELOPMENT CORPORATION, and ELIZABETH
RUTH FINE, ESQ.,

*Defendants*.

20-CV-0360

LEK/ATB

---

### MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

LETITIA JAMES
Attorney General of the State of New York

Attorney for Defendants Andrew M. Cuomo,
   Elizabeth Ruth Fine and Empire State
   Development Corporation

The Capitol
Albany, New York 12224

Andrew W. Koster
Assistant Attorney General, of Counsel
Bar Roll No. 701106
Telephone: (518) 776-2609

Date: June 2, 2020

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ....................................................................................................... 1

STANDARD OF REVIEW ......................................................................................... 4

ARGUMENT ............................................................................................................ 5

I.     THE PLAINTIFFS' CLAIMS FAIL ON STANDING AND MOOTNESS GROUNDS AS A RESULT OF LONG ISLAND'S RECENT RE-OPENING. ............................................................................................. 5

II.    THE PLAINTIFFS' SECTION 1983 CLAIM AGAINST ESD IS BARRED BY THE ELEVENTH AMENDMENT. ............................... 6

III.   SUMMARY JUDGMENT SHOULD ENTER IN FAVOR OF THE DEFENDANTS ON THE SECOND AMENDMENT CLAIM. ........................... 8

      1.   As a preliminary matter, the Executive Orders do not implicate Second Amendment rights because they are facially neutral policies meant to address a public health emergency. ................................................ 10

      2.   The Executive Orders do not substantially burden Second Amendment rights because "adequate alternatives" remain to acquire firearms. ............... 13

      3.   If any level of heightened scrutiny applies here, it would be intermediate scrutiny and the Executive Orders would pass constitutional muster. ................................................................... 14

      4.   The Central District of California's recent decisions in *Brandy* and *McDougall*. ................................................................. 17

IV.   THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' PRIVILEGES AND IMMUNITIES CLAUSE CLAIM. .................................................................................. 19

V.    SUMMARY JUDGMENT MUST ENTER IN FAVOR OF THE DEFENDANTS ON THE SUBSTANTIVE DUE PROCESS CLAIM. .............. 20

VI.   THE DECLARATORY JUDGMENT CLAIM ALSO FAILS BECAUSE IT DOES NOT PROVIDE AN INDEPENDENT CAUSE OF ACTION. ........... 22

CONCLUSION......................................................................................................... 22

## PRELIMINARY STATEMENT

Defendants Governor Andrew Cuomo, Elizabeth Fine, and the Empire State Development Corporation (collectively, "the Defendants") hereby cross-move for summary judgment on all counts and oppose the partial motion for summary judgment submitted by Plaintiffs Dark Storm Industries, Brian Doherty, and Kevin Schmucker (collectively, "the Plaintiffs"). Plaintiffs' motion seeks summary judgment against only Defendant Empire State Development Corporation ("ESD"). ESD determined that firearms retailers, such as Plaintiff Dark Storm, are not "essential" under the meaning of the Executive Orders governing the State's response to the ongoing COVID-19 pandemic. The Plaintiffs argue that this determination violates the Second Amendment to the United States Constitution because it "wholly" prevents citizens from acquiring firearms. Pl. Mem. at 6. The Defendants submit, however, that summary judgment should be granted in the State's favor on all counts. The Plaintiffs' motion must be denied and the Defendants' cross-motion must be granted.

## BACKGROUND

COVID-19 is a highly infectious and potentially deadly respiratory disease caused by a newly discovered coronavirus that spreads easily from person-to-person. *See* Declaration of AAG Koster (hereafter, "Koster Decl."), at Ex. A. Because there is no pre-existing immunity against this new virus, it has spread worldwide in an exceptionally short period of time, posing a "serious public health risk." *Id*. On January 31, 2020, the World Health Organization ("WHO") declared a "public health emergency of international concern." *See* Koster Decl. Ex. B. Less than two months later, on March 11, 2020, WHO characterized the COVID-19 outbreak as a pandemic. *See* Declaration of Brad Hutton (hereafter, "Hutton Decl."), at Ex. E. On March 13, 2020, the President of the United States declared a national emergency. *See* Koster Decl. Ex. C. In response to the rapid spread of COVID-19 within the State of New York, Governor Cuomo issued Executive

1

Order No. 202 ("EO 202"), pursuant to NYS Executive Law Article 2-B, § 28, whereby he declared a state of emergency for the entire State of New York, commencing on March 7, 2020.  *See* Declaration of Elizabeth Fine (hereafter, "Fine Decl.") at ¶ 3.  Following the issuance of Executive Order 202, Governor Cuomo issued several supplemental Executive Orders, continuing the temporary suspension and modification of certain laws relating to the state of emergency.  *See generally* Fine Decl.

The purpose of the Executive Orders is to slow the spread and manage the impact of COVID-19 within the State, because, in a short period of time, confirmed cases of—as well as deaths caused by—COVID-19 within the State increased exponentially.  *See* Koster Decl. Ex. D; Hutton Decl. Ex. T; Hutton Decl. ¶ 17.  To illustrate, on March 15, 2020, there were approximately 600 confirmed cases throughout the entire State, and the State had just reported its first two deaths. *See* Koster Decl. Ex. E.  As of May 29, 2020, confirmed cases in the State had increased to 368,284 and the number of State deaths had increased to 23,780.  *See* Hutton Decl. Ex. U.  These numbers mean that New York State is one of the largest COVID-19 hotspots in the United States, if not the world, as these figures eclipse those reported by entire countries.  *Compare* Hutton Decl. Ex. U *with* Hutton Decl. Ex. V.

According to the Centers for Disease Control ("CDC"), COVID-19 primarily spreads via person-to-person contact and may be spread not only by those who have symptoms, but also by those who are asymptomatic.  *See* Koster Decl. Ex. F.  Given the infection rate of COVID-19, slowing its spread is most effectively accomplished through the implementation of density reduction policies limiting person-to-person contact as much as possible, and the use of "social distancing" where other measures are not feasible.  *See* Koster Decl. Ex. D; Hutton Decl. ¶ 12-15. Accordingly, among other measures aimed at compelling New Yorkers to stay home and prevent

person-to-person contact—such as temporary school closures and cancellation of all social gatherings—Governor Cuomo issued Executive Orders restricting the operations of "non-essential" businesses while allowing for the continued operation of "essential" businesses.  *See generally* Fine Decl.; Hutton Decl. ¶ 16-17.  The distinction between these two categories goes to the crux of the issues in this suit.

Following the issuance of EO 202.6, ESD published guidance further defining "essential" businesses to include certain enumerated categories.  *See* Fine Decl. ¶ 18.  Moreover, where a business was not specifically listed as essential or non-essential, it was permitted to request designation as an essential business from ESD.  *Id*. at ¶ 30.

On or about March 21, 2020, Plaintiff Dark Storm Industries sought an opinion from ESD as to whether it was an essential business.  Compl. ¶ 16.  Dark Storm received a response via email dated March 21, 2020, which stated that Dark Storm was designated essential "solely with respect to work directly related to police and/or national defense matters."  Compl. ¶ 17.  Dark Storm then asked, "[s]o to be clear we may continue to conduct business with law enforcement and military but not civilians?"  Compl. ¶ 18.  ESD confirmed the accuracy of that statement.  Compl. ¶ 19.  This lawsuit followed.

In May, New York State began the re-opening process.  In order to begin the re-opening process, a given New York State region must meet seven health-related benchmarks, including hospitalization and death rates, healthcare capacity, and testing and contact tracing.  If the region meets the seven benchmarks then it is permitted to begin Phase One, which allows industries such as construction and manufacturing to re-open.  Fine Decl. ¶ 41.  Additionally, non-essential retailers (including firearms retailers) are permitted to fulfill orders via in-store pickup during Phase One.  *Id*.  Long Island began Phase One on May 27, 2019.  Fine Decl. ¶ 42.  As a result,

Dark Storm is now permitted to operate in the very manner it proposes in its papers. *See* Morrisey Decl. ¶ 9 (proposing that Dark Storm fulfill orders via pickup).

The Plaintiffs commenced this action on March 30, 2020. They did not bring an application for a temporary restraining order or preliminary injunction. Instead, they waited approximately seven weeks to bring this motion for partial summary judgment, asserting a facial challenge against ESD only. *See* Declaration of James Maloney at ¶¶ 7-8. Notably, the Plaintiffs rely only on allegations in the Complaint, an attorney declaration, and declarations from two of Dark Storm's owners. They do not submit any evidence whatsoever from any prospective firearms consumers, including the two individual plaintiffs. The Plaintiffs' motion is therefore defective, and their constitutional claim fails.

## **STANDARD OF REVIEW**

Pursuant to Rule 56, summary judgment is appropriate if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law…. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. The movant bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. If this initial burden is met, the opposing party must show that there is a material dispute of fact for trial. *See* FRCP 56(e); *Celotex*, 477 U.S. at 324.

Although the evidence and reasonable inferences should be construed in favor of the non-movant, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

585-86 (1986).  To defeat a motion for summary judgment, the non-movant must point to specific evidence showing a genuine issue for trial.  *See Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted).

In order to obtain summary judgment on their facial constitutional challenge, the Plaintiffs "must establish that no set of circumstances exists under which the [Executive Orders] would be valid."  *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015), (citing *United States v. Salerno*, 481 U.S. 739 (1987)).  The Plaintiffs have not—and cannot— meet this requirement.

## ARGUMENT

## I.   THE PLAINTIFFS' CLAIMS FAIL ON STANDING AND MOOTNESS GROUNDS AS A RESULT OF LONG ISLAND'S RECENT RE-OPENING.

As a threshold matter, the Plaintiffs lack standing because Long Island is in Phase One of the re-opening process.  "The three elements comprising Article III standing are well established: a plaintiff must show (1) an 'injury in fact'—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the plaintiff's injury and the challenged conduct; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98, 102 (2d Cir. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, (1992)).  The Plaintiffs must establish standing for each cause of action at each stage of the case and, for prospective injunctive relief, past injury alone will not suffice.  *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (standing must be established before proceeding to consider the merits of a claim at each stage of a proceeding.); *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (past injury alone will not establish standing for

5

prospective injunctive relief) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)).  Here, the Plaintiffs lack standing because the alleged past injury does not suffice for the declaratory relief they seek in their motion.  *Id.*  Even assuming, *arguendo*, that the Plaintiffs were previously unable to purchase firearms, that is no longer the case: on May 27, 2020, Long Island began Phase One of the re-opening process, pursuant to which non-essential retailers such as Dark Storm's store are permitted to fulfill deliveries via in-store pickup.  *See* Fine Decl. ¶ 41.  This is precisely the relief proposed by the Plaintiffs in this action. *See* Morrisey Decl. ¶ 9.  As a result, the Plaintiffs lack standing because they cannot show anything other than an alleged past injury.

Summary judgment should enter in favor of the Defendants on mootness grounds for the same reason.  "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *New York City Employees' Ret. Sys. v. Dole Food Co., Inc.*, 969 F.3d 1430, 1433 (2d Cir. 1992) (internal quotation marks omitted).  "When this occurs, the Constitution's case or controversy requirement, U.S. Const. Art. III, § 2, is not satisfied and a federal court lacks subject matter jurisdiction over the action."  *Id.*  Here, the issues presented are no longer live because the Plaintiffs can now act in the manner they proposed.  *See supra*.  The claims are therefore moot.

## II.   THE PLAINTIFFS' SECTION 1983 CLAIM AGAINST ESD IS BARRED BY THE ELEVENTH AMENDMENT.

The Plaintiffs seek partial summary judgment against ESD only, arguing that they are entitled to such relief because "ESD can be sued under 42 U.S.C. § 1983."  Pl. Mem. at 7-8. This claim is barred by the Eleventh Amendment to the United States Constitution, which "bars a suit in law or equity in federal court against a State absent the State's consent to such a suit or congressional abrogation of immunity."  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54

(1996).  "[I]t is beyond dispute that the State of New York and its agencies have never consented

to be sued in federal court."  *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594-95 (2d Cir. 1990).

Congress did not abrogate New York's Eleventh Amendment immunity by enacting Section

1983.  *Aron v. Becker*, 48 F. Supp.3d 347, 366 (N.D.N.Y. 2014).  Furthermore, the Supreme

Court has held that states, state agencies, and state officials sued in their official capacities are

not "persons" subject to suit under Section 1983.  *Will v. Michigan Dep't of the State Police*, 491

U.S. 58, 70-71 (1989).  *See also Spencer v. Doe*, 139 F.3d 107, 111 (2d Cir. 1998) ("Neither a

state nor one of its agencies nor an official of that agency sued in his or her official capacity is a

'person' under § 1983.").[1]  Here, "Empire State Development" is the term used to collectively

describe the New York State Department of Economic Development ("DED") and the New York

State Urban Development Corporation ("UDC").  *See* Fine Decl. ¶ 1, 19.  However, the

Guidance was issued by DED.  Fine Decl. ¶ 19.  DED is a state agency.  *See* N.Y. Econ. Dev.

Law § 10 ("There shall be in the state government a department of economic development").   It

is therefore not a "person" under the meaning of the statute and the Plaintiffs are not entitled to

summary judgment.

The Plaintiffs' reliance on *Brentwood Academy v. Tennessee Second School Athletic*

*Ass'n*, 531 U.S. 288 (2001), is misplaced because ESD is a state agency and not a private actor.

According to the Plaintiffs, this case shows that ESD can be sued under Section 1983 "because,

having been expressly delegated authority by the State to act in this specific instance, [ESD's]

---

[1] The *Ex parte Young* doctrine does not save the Plaintiffs' claim.  "Under the doctrine of *Ex parte Young*, a 'plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that [her] complaint[:] (a) alleges an ongoing violation of federal law[;] and (b) seeks relief properly characterized as prospective.' "  *Aron*, 48 F. Supp.3d at 367 (quoting *Clark v. DiNapoli*, 510 Fed. Appx. 49, 51 (2d Cir. 2013) (brackets and quotations in original)).  Here, the Plaintiffs seek summary judgment not against an official capacity state officer, but rather against the State itself.  *See* Maloney Decl. ¶ 1 (seeking summary judgment only against the state agency and not the other defendants).  *Ex parte Young* is therefore inapplicable.

7

behavior may be fairly treated as that of the State itself."  Pl. Mem. at 8 (internal quotation marks omitted).  The defendant in *Brentwood* was a non-profit athletic association ("the Association") that regulated interscholastic sports among public and private high schools in Tennessee.  *Id.* at 291.  The Court acknowledged that the Association was not a state entity, but held that its "nominally private character is overborne by the pervasive entwinement of public institutions and public officials in is composition and workings."  *Id.* at 298.  In other words, it could be considered a state actor because its actions were "entwined" with state action: for example, the Association's membership consisted mostly of public schools that were in turn represented by principals or faculty members, *id.* at 298, and the Association's employees were eligible to enroll in the state retirement system, *id.* at 300.  The Court therefore concluded that constitutional standards could be applied to the Association.  Here, however, ESD is not merely a private actor that is entwined with State operations—it is a State agency.  Fine Decl. ¶ 19.  As a result, *Brentwood* is inapplicable and the Plaintiffs' Section 1983 claim against ESD fails.

## III.    SUMMARY JUDGMENT SHOULD ENTER IN FAVOR OF THE DEFENDANTS ON THE SECOND AMENDMENT CLAIM.

Even if the Plaintiffs could assert a Section 1983 claim against ESD, they are not entitled to summary judgment on their Second Amendment claim.  In fact, summary judgment should enter in favor of the Defendants.  The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  The United States Supreme Court has interpreted the Second Amendment to guarantee, at its core, the right of an individual to possess a handgun for self-defense in the home.  *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), and has held that the Second Amendment applies to states through the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).  But the rights protected

by the Second Amendment are not unlimited: the Supreme Court has stated that its holdings should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. The Supreme Court has not, however, "delineated . . . the standards by which lower courts should assess the constitutionality of firearms restrictions." *New York State Rifle*, 804 F.3d at 254.

In the absence of guidance from the Supreme Court, the Second Circuit, like most other Circuits, adopted a two-step inquiry to determine the constitutionality of firearms restrictions. *New York State Rifle & Pistol Ass'n Inc. v. City of New York*, 883 F.3d 45, 55 (2d Cir. 2018) (*vacated on other grounds*, 140 S.Ct. 1525 (April 27, 2020) (per curium opinion) (dismissing appeal on mootness grounds)). First, a court must "determine whether the challenged legislation impinges upon conduct protected by the Second Amendment." *Id.* Second, if the court concludes that the statute impinges upon Second Amendment rights, it will "next determine and apply the appropriate level of scrutiny." *Id.* Only if the challenged law is found to impose a "substantial burden" on the right to keep and bear arms is "some form of heightened scrutiny" appropriate. *N.Y. State Rifle*, 804 F.3d at 259 (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 93(2d Cir. 2012)).

Under this framework, where a substantial burden is found or assumed, the Second Circuit and courts in this Circuit have generally applied intermediate scrutiny—under which the court assesses whether a law is substantially related to an important government objective—in assessing the constitutionality of the challenged measure. *See, e.g.*, *N.Y. State Rifle*, 804 F.3d at

260-61; *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013); *Kachalsky*, 701 F.3d at 96-97; *N.Y. State Rifle*, 883 F.3d at 61-62; *Aron*, 48 F. Supp. 3d at 371.

At the outset, the Defendants note that summary judgment must enter against plaintiff Dark Storm because its claim is predicated on the allegation that it is currently unable to operate its business. See Compl. ¶ 2 (alleging that Dark Storm "can no longer transact business" as a result of the Executive Orders). The Second Amendment, however, "does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017). As a result, summary judgment must enter against plaintiff Dark Storm.

In any event, and assuming *arguendo* and without conceding that the Executive Orders impinge on conduct protected by the Second Amendment, *see, e.g.*, *N.Y. State Rifle*, 804 F.3d at 257, heightened scrutiny is inapplicable here—and the Second Amendment claim therefore fails—because the Executive Orders do not substantially burden Second Amendment rights insofar as "adequate alternatives" remain to acquire firearms. Alternatively, even if heightened scrutiny did apply, the Executive Orders would pass constitutional muster.

1.   **As a preliminary matter, the Executive Orders do not implicate Second Amendment rights because they are facially neutral policies meant to address a public health emergency.**

The argument that the Executive Orders burden Second Amendment rights is undercut by the fact that the Constitution recognizes the extraordinary powers possessed by State government in times of public health emergencies. As the Supreme Court has made clear, "upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905). As a result, and as the Constitution recognizes, the power to impose quarantines and other public health measures is perhaps the archetypal police

power that state and local governments possess.  *See, e.g.*, *id*. at 25; *Compagnie Francaise De Navigation A Vapeur v. La. State Bd. of Health*, 186 U.S. 380, 387 (1902); *Morgan S.S. Co. v. La. Bd. of Health*, 118 U.S. 455, 460 (1886); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 203 (1824) ("quarantine laws" and "health laws of every description" are within states' power to enact).  Such police power is "the most essential of powers, at times the most insistent, and always one of the least limitable powers of government."  *District of Columbia v. Brooke*, 214 U.S. 138, 149 (1909).

In the face of "prevalent and increasing" disease, courts "would usurp the functions of another branch of government if it adjudged, as a matter of law, that the mode adopted under the sanction of the State, to protect the people at large, was arbitrary and not justified by the necessities of the case."  *Jacobson*, 197 U.S. at 28.  As a result, members of the public can be required to tolerate measures far more intrusive than the temporary closure of business at issue here.  *See, e.g.*, *Jacobson*, 197 I.S. at 26, 31 (state may compel vaccination against smallpox on pain of criminal prosecution).

The Executive Orders at issue here—which are far less onerous than other public health laws that have been upheld by the Supreme Court, *see infra* Argument § II.3—are constitutionally sound in the context of this unprecedented global pandemic.  In fact, courts around the country have upheld similar COVID-19-related closure orders at least in part due to the deference described in *Jacobson*.  *See, e.g.*, *Legacy Church, Inc. v. Kunkel*, No. CIV 20-0327 JB/SCY, 2020 WL 1905586, at *40 (D. N.M. April 17, 2020) (citing *Jacobson* and stating that "the Court is not in a position to second-guess expert decisions on which restrictions will be most effective at saving lives during an epidemic when those restrictions are based not on suppression of religion but suppression of an epidemic"); *Carter v. Kemp*, No. 1:20-CV-1517-SCJ, at 31

(N.D. Ga. April 20, 2020) (rejecting Second Amendment claim and citing *Jacobson* for the proposition that "the state has a considerable public health interest in curtailing normal activities to stop the exponential spread of a deadly virus") (attached as Exhibit G to the Koster Declaration).  Notably, the Supreme Court recently relied on *Jacobson* when it rejected a church's challenge to a COVID-19-related order which placed numerical restrictions on public gatherings.  *See South Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1 (U.S. Supreme Court May 29, 2020) (quoting *Jacobson*, 197 U.S. at 38) ("Our Constitution principally entrusts 'the safety and health of the people' to the politically accountable officials of the States to 'guard and protect.' ").

Furthermore, the facially-neutral and generally applicable nature of the Executive Orders—which apply to all non-essential entities, even those with constitutional dimensions like houses of worship and political organizations—supports its constitutionality.  *See, e.g.*, Fine Decl. Ex. M (houses of worship).  The Supreme Court has held, time and time again, that generally-applicable rules do not violate constitutional rights despite placing burdens on that right.  For example, in the First Amendment context, the Supreme Court upheld a state "public health regulation of general application" that closed a bookstore found to be a public-health nuisance.  *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986).  In another case, the Supreme Court held that incidental burdens on the free exercise of religion do not relieve people from the obligation to comply with laws that are "not specifically directed at their religious practice." *Emp't Div., Dep't of Human Res. Of Or. v. Smith*, 494 U.S. 872, 878 (1990).[2]  And, in *South Bay United Pentecostal Church*, the Supreme Court upheld the COVID-19 order in part because

---

[2] At least two federal Circuit Court judges have argued in dissent that this concept should be applied in the Second Amendment context.  *See Teixeira v. Cty. of Alameda*, 873 F.3d 670, 698 (9th Cir. 2017) (en banc) (Bea, J., dissenting); *Pena v. Lindley*, 898 F.3d 969, 1008 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part).

"[s]imilar or more severe restrictions apply to comparable secular gatherings." *South Bay United Pentecostal Church*, 2020 WL 2813056, at *1. *See also* Darrell Miller, *Second Amendment: Incidental Burdens in a Pandemic*, Second Thoughts: A Blog from the Center for Firearms Law at Duke University (April 6, 2020) (discussing facial neutrality in the context of assessing burdens on constitutional rights) (attached as Exhibit H to the Koster Declaration). Because the Executive Orders do not specifically target Second Amendment rights (or any other rights, for that matter), they are facially neutral and generally applicable and therefore constitutional. The Court's analysis should go no further.

### 2. The Executive Orders do not substantially burden Second Amendment rights because "adequate alternatives" remain to acquire firearms.

In any event, the Executive Orders at issue here do not substantially burden the Second Amendment because adequate alternatives remain for citizens to acquire firearms. The Second Circuit held that a "law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *DeCastro*, 682 F.3d 160, 168 (2d Cir. 2012). *Compare Heller*, 554 U.S. at 629 (handgun ban made "it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional").

Dark Storm is now permitted to fulfill orders in the very manner requested by the Plaintiffs because Long Island is now in Phase One of the re-opening process. *See* Fine Decl. ¶ 41 (firearms retailers can fulfill orders via in-store pickup); Morrisey Decl. ¶ 9 (proposing that Dark Storm fulfill orders via pickup). Even if that were not the case, the record shows that even before any part of New York began Phase One, citizens could purchase firearms throughout the

State at stores like Walmart and Runnings.[3]  *See* Declarations of Kathleen Coppersmith, Clint Dumoulin, Jennifer Hill, Jessica Holland, Andrea Hughes, Joseph Kelly, Brian Metz, Ken Peters, Chad Shelmidine, and Sal Ventola (affirming that various types of firearms and ammunition are available for purchase at Walmart and Runnings stores throughout New York State).  Clearly, then, "adequate alternatives" remained to purchase firearms throughout this state of emergency. As a result, the Second Amendment was never substantially burdened and the Plaintiffs' motion for summary judgment must be denied.  This ends the analysis.  *See DeCastro*, 682 F.3d at 168 (rejecting facial challenge and finding no substantial burden requiring heightened scrutiny if adequate alternatives remain to acquire firearms for self-defense).

### 3.  If any level of heightened scrutiny applies here, it would be intermediate scrutiny and the Executive Orders would pass constitutional muster.

Where a law substantially burdens Second Amendment rights (and assuming *arguendo* that is the case here), courts assess how severely the challenged provision burdens that right in order to determine the level of scrutiny applicable.  *See, e.g.*, *N.Y. State Rifle*, 883 F.3d at 61-62.  Intermediate scrutiny, at most, should apply here for two reasons.  First, the Second Circuit and district courts in this Circuit typically apply intermediate scrutiny at this stage of the analysis—including in assessing and upholding the constitutionality under the Second Amendment of New York's firearms licensing law, with respect to both public carry and in-home possession.  *See, e.g.*, *Kachalsky*, 701 F.3d at 96; *N.Y. State Rifle*, 804 F.3d at 247; *Aron*, 48 F. Supp.3d at 369-72.

Second, intermediate scrutiny—at most—would apply here because the courts have applied this level of scrutiny in cases where the challenged laws arguably burdened Second

---

[3] Data published by the FBI shows that 27,035 background checks on the National Instant Criminal Background Check System ("NICS") were made in New York State in April 2020.  This suggests that sales are still being made. *See* Koster Declaration Ex I.

Amendment rights more substantially than the Executive Orders at issue here. *See, e.g.*, *Kachalsky*, 701 F.3d at 96 (laws prohibiting public carry and generally prohibiting concealed possession in public survived intermediate scrutiny); *N.Y. State Rifle*, 804 F.3d at 247 (applying intermediate scrutiny to laws prohibiting possession of semiautomatic weapons, large-capacity magazines, and law limiting number of bullets in magazine); *Aron*, 48 F. Supp.3d at 369-72 (New York State's handgun licensing requirements survived intermediate scrutiny); *Kwong*, 723 F.3d at 167 (holding heightened scrutiny was not triggered by $340 handgun licensing fee but that even if court did apply heightened scrutiny, intermediate scrutiny at most would apply and fee would survive such scrutiny).

Here, the Executive Orders do not ban a class of firearms, restrict who can bear arms, or limit the lawful possession of firearms. They merely limit purchasing options on a temporary basis in light of an ongoing and unprecedented public health emergency. The Executive Orders do not cause the seizure of firearms for those who already have them and do not prohibit lawful carrying or possession in the home. The Orders temporarily narrow the number of places from which one can purchase a firearm to prevent the potential for exponential spread of COVID-19 during a public health emergency.[4] For these reasons, intermediate scrutiny is, at most, what the Court should apply here as well.[5]

---

[4] The Plaintiffs argue that the Executive Orders go "even further than the ban at issue in *Heller* because it makes any and all legal acquisition of firearms and ammunition impossible." Pl. Mem. at 9. The evidence shows that this is incorrect. *See supra*, Argument § II(2) (adequate alternatives exist to purchase firearms in New York State). In fact, the law at issue in *Heller* was more restrictive than the rule at issue here. In *Heller*, the Supreme Court struck down a "total ban on handguns," *id*. at 576, including a ban on handgun possession in the home. *Id*. at 636. The Court determined that this ban amounted to "a prohibition on an entire class of 'arms' that American overwhelmingly choose for the lawful purpose of self-defense." *Id*. at 628. The Executive Orders do not include a similar ban but instead merely restrict purchasing options on a temporary basis during a public health emergency. They do not include—expressly or by implication—a "ban" of any kind.
[5] Indeed, other courts have upheld limits on the ability to purchase firearms, such as background checks, waiting periods, licensing laws, and training requirements as consistent with the Second Amendment, even though they bring with them delays on immediate acquisition. *See, e.g.*, *Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050 (D. Colo. 2014) (background checks) (vacated on standing grounds, 823 F.3d 537 (10th Cir. 2016)); *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) (waiting period); *Libertarian Pty. of Erie Cty. v. Cuomo*, 300 F. Supp. 3d

Under intermediate scrutiny, the Court must assess whether a law "is substantially related to the achievement of an important governmental interest."  *Kachalsky*, 701 F.3d at 96-97; *N.Y. State Rifle*, 883 F.3d at 62.  As the Second Circuit recently stated:

> To survive intermediate scrutiny, the fit between the challenged regulation [and the government interest] need only be substantial, not perfect. Unlike strict scrutiny analysis, we need not ensure that the statute is narrowly tailored or the least restrictive available means to serve the stated governmental interest. Moreover, we have observed that state regulation of the right to bear arms has always been more robust than analogous regulation of other constitutional rights. So long as the defendants produce evidence that fairly supports their rationale, the laws will pass constitutional muster.

*N.Y. State Rifle*, 804 F.3d at 261.  Courts give "substantial deference" to efforts to design solutions to address public safety and well-being.  *Kachalsky*, 701 F.3d at 97, (*citing Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 665 (1994)).   And, in a facial challenge like that at issue here, the Plaintiffs must demonstrate that there are no circumstances under which the Executive Orders would be valid.  *DeCastro*, 682 F.3d at 163.

Here, the important governmental interest is limiting the transmission of the COVID-19 virus, which as of May 29, 2020 has infected approximately 1.7 million Americans and killed more than 102,000 Americans, costing almost 23,780 New Yorkers their lives in a matter of two months.  *See* Hutton Decl. Ex. W.  There can be no dispute that stopping the spread of this deadly virus is an important governmental interest.  Furthermore, the Executive Orders are substantially related to the achievement of the goal of preventing the transmission of COVID-19. The Executive Orders are designed to curb transmission by promoting social distancing.  *See*

---

424 (W.D.N.Y. 2018) (licensing) (appeal docketed, No. 18-386 (2d Cir. Feb. 8, 2018)); *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) (training).

Hutton Decl. at ¶ 12-17.  They therefore require most businesses to close and/or utilize telecommuting technology.  Hutton Decl. ¶ 16-17; Fine Decl. ¶ 9-12.  As a result, hundreds of categories of businesses in New York—including gun shops—cannot open for business.  Hutton Decl. ¶ 16-17; Fine Decl. ¶ 9-12.  Closing stores slows the spread of the virus by limiting physical interaction and promoting social distancing, both in the businesses and at other locations by limiting the risk of exposure.  Hutton Decl. ¶ 12-17.  Indeed, it is now clear that avoiding unnecessary personal interaction has "flattened the curve," and potentially saved an untold number of lives.  *See* Hutton Decl. ¶ 18-20; Koster Decl. Ex. J ("Hospitals in hard-hit areas needed fewer ventilators than expected, experts say, because social distancing and lockdowns meant that COVID-19 cases peaked earlier and at lower numbers.").

The benefits of social distancing are well known and beyond dispute.  As a result, the rule requiring non-essential businesses to close is substantially related to the important governmental interest of slowing the spread of COVID-19.  The Executive Orders therefore survive intermediate scrutiny.  The Plaintiffs' partial motion must be denied and the Defendants motion must be granted.

### 4.  The Central District of California's recent decisions in *Brandy* and *McDougall*.

The federal court in the Central District of California reached a similar conclusion on April 6, 2020, when it denied an application for a temporary restraining order in *Brandy v. Villanueva*, CV 20-02874-AB (SKx) (C.D. Ca. April 6, 2020) (attached as Exhibit K to the Koster Declaration).  The plaintiffs in that case brought Second Amendment challenges to orders issued by the County of Los Angeles and the City of Los Angeles, both of which ordered all non-essential business to cease operations.  *Brandy*, at 2.  Firearms and ammunition retailers were originally designated non-essential under the County order, but that decision was reversed on

March 30, 2020. *Id*. The City's order did not designate businesses that sell or repair firearms or sell ammunition as essential businesses. *Id*.

In analyzing the Second Amendment challenge, the court applied intermediate scrutiny because "the County and City orders are simply not as sweeping as the complete handgun ban at issue in" *Heller*. *Id*. at 5 (citing *Fyock v. Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015)). The court applied intermediate scrutiny and held:

> "The City's and County's stated objective—reducing the spread of COVID-19, a highly dangerous and infectious disease—undoubtedly constitutes an important government objective. Moreover, because this disease spreads 'where an infected person coughs, sneezes or otherwise expels aerosolized droplets containing the virus,' . . . the closure of non-essential businesses, including firearms and ammunition retailers, reasonably fits the City's and County's stated objectives of reducing the spread of this disease."

*Id*. at 5-6.

The Central District of California also declined to enter a TRO in *McDougall v. County of Ventura California*, 20-CV-02927-CBM-(ASx) (C.D. Ca. March 31, 2020) (attached as Exhibit L to the Koster Declaration). There, the County ordered the closure of gun stores pursuant to the "Stay Well at Home" order. *McDougall*, at 1. The order was issued "to ensure that the maximum number of persons stay in their places of residence to the maximum extent feasible in order to combat the spread of the COVID-19 virus." *Id*. (internal quotation marks omitted). In denying the motion for a TRO, the court applied intermediate scrutiny to the Plaintiff's Second Amendment claim because the County order is "not as sweeping as the complete handgun ban in *Heller*" insofar as it does not specifically target handgun ownership, does not prohibit the ownership of a handgun outright, and is temporary." *Id*. at 2. Applying

18

intermediate scrutiny, the court ultimately denied the motion for a TRO. The same rationale is applicable here.[6]

Like the orders at issue in the Central District of California cases, the Executive Order in New York does not designate firearms retailers as essential businesses. Nor does it specifically target gun ownership or prohibit gun possession. Instead, all of these orders are unquestionably neutral and generally applicable measures intended to reduce the spread of COVID-19. As a result, the Plaintiffs partial motion should be denied and the Defendants motion should be granted.

## IV.   THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' PRIVILEGES AND IMMUNITIES CLAUSE CLAIM.

In Count Two, the Plaintiffs assert a claim pursuant to Article IV, Section 2 of the United States Constitution, commonly known as the Privileges and Immunities Clause. *See* Compl. ¶ 32. The Clause states that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U. S. Const. Art. IV, § 2, cl. 1. "The Clause operates to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those states are concerned." *Schoenefeld v. Schneiderman*, 821 F.3d 273, 279 (2d Cir. 2016) (internal quotation marks omitted). "To prevail on a Privileges and Immunities challenge, a plaintiff must demonstrate that the state has burdened nonresident activity that is 'sufficiently basic to the livelihood of the Nation as to fall within the purview of the Privileges and Immunities Clause.' " *Id*. (quoting *Supreme Court of*

---

[6] Second Amendment challenges to COVID-19 related orders have also been rejected in different factual circumstances. For example, in *Carter*, the federal court for the Northern District of Georgia considered Georgia's decision to stop issuing weapons licenses during the COVID-19 pandemic. *See Carter* at 25 (attached to the Koster Declaration as Exhibit G). The plaintiff argued that the rule violated her Second Amendments rights insofar as it prevented her from carrying a handgun in self-defense. *Id*. at 22. The court rejected the claim—without applying heightened scrutiny—because Georgia law allows citizens to carry handguns in the home, car, or place of business without a weapons license. *Id*. at 26-27.

*Va. v. Friedman*, 487 U.S. 59, 64 (1988)).  "[C]onstitutionally protected privileges and immunities are *burdened* only when [challenged] laws were enacted for [a] protectionist purpose."  *Id.* (quoting *McBurney v. Young*, 569 U.S. 2212, 227 (2013) (brackets and emphasis in original)).

Here, there can be no dispute that the Executive Orders were <u>not</u> enacted for a protectionist purpose.  To the contrary, they were enacted specifically to slow the spread of the COVID-19 virus.  *See* Hutton Decl. ¶ 15-17; *N.Y. State Rifle*, 883 F.3d at 65 (rule designed to protect legitimate health and safety concerns is not protectionist).  There is no evidence—or even any allegation—that the Executive Orders at issue discriminate against non-New York residents in any way.  As a result, the Privileges and Immunities Clause is inapplicable here and summary judgment should enter in favor of the Defendants on Count Two.

**V.    SUMMARY JUDGMENT MUST ENTER IN FAVOR OF THE DEFENDANTS ON THE SUBSTANTIVE DUE PROCESS CLAIM.**

In Count Three, the Plaintiffs assert a substantive due process claim.  Compl. ¶ 34.  This claim must be rejected at the outset because it is merely duplicative of the Second Amendment claim.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Graham v. Connor*, 490 U.S. 386 (1989) and stating that where "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims").

The substantive due process claim would fail even if it were not duplicative.  To allege a substantive due process claim, a plaintiff must allege that "(1) the complained of state action compromised a constitutionally-protected liberty or property right, and (2) the state action that deprived [it] of that interest was oppressive or arbitrary."  *Adams v. Smith*, No. 8:07-CV-0452

(LEK/RFT), 2015 WL 4139686, at *10 (N.D.N.Y. July 9, 2015). "Conduct is arbitrary when it
is not merely incorrect, but 'shocks the conscience.' " *Id.* (citing *O'Connor v. Pierson*, 426 F.3d
187, 203 (2d Cir. 2005)). The Second Circuit has articulated that to "shock the conscience," the
government must engage in "malicious and sadistic abuses of power . . . intended to oppress or
cause injury and designed for no legitimate government purpose." *Rinaldi v. City of New York*,
No. 13 Civ. 4881 (LAK/JLC), 2014 WL 2579931, at *6 (S.D.N.Y. June 10, 2014) (quoting
*Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001) (internal quotations
omitted)).

      Here, none of the three Plaintiffs can satisfy the "shocks the conscience" standard
because there is a legitimate basis for the State's actions—stopping the spread of COVID-19.
There is no evidence whatsoever that this action was motivated by a "malicious and sadistic
abuse of power" "intended to oppress or cause injury." To the contrary, the Executive Orders—
which are general in nature and apply to a wide variety of businesses having nothing to do with
firearms—are designed to *prevent* injury to the public through further spread of COVID-19.
Hutton Decl. ¶ 15-17; Fine Decl. Ex M.

      Finally, plaintiff Dark Storms' substantive due process claim fails because it cannot show
the deprivation of a constitutionally protected interest. It was merely unable to operate its
business—its right to bear arms was not implicated in any way. However, harm to business
operations cannot support a due process claim. *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F. Supp.
3d 94, 136 (N.D.N.Y. 2018) (stating that "decisions within this Circuit indicate that allegations
of harm to a plaintiff's 'business operations' may not form the basis of a due process claim").
Summary judgment must enter in favor of the Defendants on Count Three.

**VI.    THE DECLARATORY JUDGMENT CLAIM ALSO FAILS BECAUSE IT DOES NOT PROVIDE AN INDEPENDENT CAUSE OF ACTION.**

To the extent that the Plaintiffs assert a claim pursuant to the Declaratory Judgment Act, 28 U.S.C §§ 2201-2202, the claim fails because the Declaratory Judgment Act does not "provide an independent cause of action.  Its operation is procedural only—to provide a form of relief previously unavailable.  Therefore, a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief."  *In re Joint Eastern and Southern District Asbestos Litigation*, 14 F.3d 726, 731 (2d Cir. 1993) (internal citations omitted).  *See also Porat v. Lincoln Towers*, No. 04 Civ. 3119 (LAP), 2005 WL 646093, at *7 (S.D.N.Y. 2005) (dismissing declaratory judgment claim because all other federal claims were dismissed).  As described above, the Plaintiffs do not have a substantive claim of right to the requested relief.  The Declaratory Judgment claim must therefore be rejected along with the rest of the Plaintiffs' claims.

<u>**CONCLUSION**</u>

WHEREFORE, the Plaintiffs' partial motion for summary judgment should be DENIED and the Defendants' motion for summary judgment should be GRANTED.

Dated: Albany, New York
       June 2, 2020

                                 LETITIA JAMES
                                 Attorney General of the State of New York

                                 Attorney for Defendants Andrew M. Cuomo,
                                       Elizabeth Ruth Fine and Empire State
                                       Development Corporation

                                 The Capitol
                                 Albany, New York 12224

                               By: *s/ Andrew W. Koster*
                                 Andrew W. Koster
                                 Assistant Attorney General, of Counsel
                                 Bar Roll No. 701106
                                 Telephone: (518) 776-2609
                                 Email: andrew.koster@ag.ny.gov

TO:    James M. Maloney, Esq.
         33 Bayview Avenue
         Port Washington, NY  11050