TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

POINT I

PLAINTIFFS' CLAIMS ARE NOT MOOTED BY "PHASE I" REOPENING . . . . . . . . . . . . . 2

POINT II

ESD CAN BE SUED UNDER 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

POINT III

ESD's DETERMINATION VIOLATES THE SECOND AMENDMENT . . . . . . . . . . . . . . . . . 4

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PRELIMINARY STATEMENT

This memorandum of law is submitted in reply in further support of Plaintiffs' motion for partial summary judgment and in opposition to Defendants' cross-motion for summary judgment.

ARGUMENT

POINT I

PLAINTIFFS' CLAIMS ARE NOT MOOTED BY "PHASE I" REOPENING

The United States Supreme Court, in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), held that a state governor's "voluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" 137 S. Ct. at 2019 n.1 (2017) (modification in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)). Here, Defendants "have not carried the 'heavy burden' of making 'absolutely clear' that [they] could not revert to [their prior] policy," *id.*, of imposing unconstitutional infringements on the sale of firearms, because the change in policy is neither permanent nor irrevocable. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013); *City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983).

Indeed, the reopening currently under way is repeatedly described in Defendants' papers as "Phase I" of a process that may or may not continue. See Brief (Doc. 24-1) at 3 (describing health "benchmarks" that must be met, all of which are, by definition, variables that could change); Fine Dec. (Doc. 24-16) at ¶ 40.

Although it is true that Plaintiff Dark Storm is now permitted to operate in essentially the manner proposed in the Morrisey Declaration, see Brief at 6, the COVID-19 crisis is not a situation in which certainty as to future outcomes can be expected. If cases of the disease go back on the rise, it is inevitable that the complained-of policy will be re-implemented. Defendants go to great lengths in their papers to point out how unprecedented this crisis is, but it is precisely for that reason that recent measures giving temporary relief to the plaintiffs here cannot be assumed to be continued if a resurgence of infections occurs.

POINT II

ESD CAN BE SUED UNDER 42 U.S.C. § 1983

Defendants argue that *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001), is inapposite, and the ESD has Eleventh Amendment sovereign immunity on the theory that it is "a state agency and not a private actor," Brief at 7. But this ignores the fact that ESD, as an entity existing under the laws of the State of New York, is nothing more nor less than a domestic business corporation—as indicated by the Department of State's own listing (see Document 16-5).

To claim Eleventh Amendment sovereign immunity, ESD must show that it is indeed an arm of the State. This it has failed to do. While the Fine Declaration (Doc. 24-16) speaks of the Department of Economic Development ("DED") and the New York State Urban Development Corporation being "collectively . . . known as" ESD, *see id.* at ¶ 1, the consequences of sovereign immunity cannot be based on such an amorphous premise. The Executive Orders at issue delegated interpretive authority to ESD, a corporation, and that corporation exercised that

3

interpretive authority to the detriment of Plaintiffs' rights.  ESD is by no means automatically immune from suit based on its simply being "known as" an entity that somehow subsumes a state department (DED).  See generally John R. Pagan, "Eleventh Amendment Analysis," 39 Ark. L. Rev. 447 (1986).

POINT III

ESD's DETERMINATION VIOLATES THE SECOND AMENDMENT

The Second Amendment "protect[s] an individual right to use arms for self-defense," and "takes certain policy choices off the table."  *Heller*, 554 U.S. at 616, 636.  In *Heller*, it was the complete prohibition on handguns that made the policy choice untenable.  Here, ESD's determination has amounted to a policy choice (it was delegated authority to determine whether it is in the "best interest of the state" to have a given business's workforce continue), and one which goes even further than the ban at issue in *Heller* because it makes any and all legal acquisition of firearms and ammunition impossible.

Defendants argue in their opposition, Brief at 10, that because Dark Storm's business interests are affected, there is no "freestanding right" to sell firearms.  But here, all businesses selling firearms were affected by ESD's decision, such that persons throughout the state were (and may again become) wholly unable to purchase firearms or ammunition.  Were a parallel to the Defendants' argument to be made in a First Amendment context, it would be ludicrous.  If an Executive Order were interpreted so as to shut down all newspapers, news television, news radio, etc., it would be axiomatic that First Amendment issues would be implicated.  Just as such closures of news media would implicate the First Amendment by virtue of citizens' right to acquire information, so does a closure of gun stores implicate the Second Amendment by virtue of citizens' right to acquire firearms or ammunition.

As federal courts have repeatedly recognized, the "right to possess firearms for protection implies . . . corresponding right[s]" without which "the core right wouldn't mean much." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (addressing right to train with firearms). And the right to keep and bear arms would mean little indeed without the corresponding right to acquire arms in the first place. Indeed, if the right to possess a firearm is to have any meaning, it necessarily must include the right to *acquire* a firearm, which makes the right of acquisition the most fundamental prerequisite of legal gun ownership. *See Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 938 (N.D. Ill. 2014). Correspondingly, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Courts have consistently held that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id*. (internal quotation marks omitted); see also *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017), *aff'd* 742 Fed. App'x 218 (9th Cir. 2018) ("Without protection for the closely related right to keep and bear ammunition magazines for use with the arms designed to use such magazines, the Second Amendment would be toothless.") (internal quotation marks omitted)).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion should be GRANTED and Defendants' cross-moton DENIED.

James M. Maloney
June 8, 2020