UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

DARK STORM INDUSTRIES LLC, *et al.*,

                            Plaintiffs,

      -against-                          1:20-CV-0360 (LEK/ATB)

ANDREW CUOMO, *et al.*,

                            Defendants.

---

## <u>MEMORANDUM-DECISION AND ORDER</u>

## I.     INTRODUCTION

Plaintiffs Dark Storm Industries LLC ("Dark Storm"), Brian Doherty, and Kevin Schmucker have brought this action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201–02 against New York Governor Andrew Cuomo, the Empire State Development Corporation ("ESD"), and Elizabeth R. Fine, Deputy Commissioner of the New York State Department of Economic Development. Dkt. No. 1 ("Complaint"). Plaintiffs assert that Defendants violated several provisions of the U.S. Constitution, in particular the Second Amendment, when, in response to the COVID-19 pandemic, they deemed gun shops not to be essential businesses and ordered them closed. <u>Id.</u>

Now before the Court are the parties' cross-motions for summary judgment. Plaintiffs seek a declaratory judgment holding unconstitutional ESD's determination that retailers of firearms and ammunition are non-essential except when doing business with police and military customers. Dkt. Nos. 13 ("Plaintiffs' Motion"); 14 ("Plaintiffs' Memorandum"); 15 ("Plaintiffs' Statement of Material Facts" or "Plaintiffs' SMF"). Defendants oppose Plaintiffs' Motion and have cross-moved for summary judgment in their own right, seeking dismissal of the Complaint. Dkt. Nos. 24 ("Defendants' Cross-Motion"); 24-1 ("Defendants' Memorandum"); 24-2

("Defendants' Response to Plaintiffs' SMF" and "Defendants' SMF"). Plaintiffs oppose

Defendants' Cross-Motion. Dkt. Nos. 27 ("Plaintiffs' Reply"); 26-1 ("Plaintiffs' Response to

Defendants' SMF").

Because the Court concludes that the challenged regulations survive intermediate

scrutiny, the Court denies Plaintiffs' Motion and grants Defendants' Cross-Motion.

## II.   BACKGROUND

### A.  Factual Background

The following facts are undisputed, except where otherwise noted. Where necessary, the

Court provides additional details in its analysis.

#### 1. The COVID-19 Pandemic

COVID-19 is a highly infectious respiratory disease caused by a newly discovered

coronavirus. Defs.' SMF ¶ 1. Because there is no pre-existing immunity to this coronavirus, the

disease has spread quickly around the globe and poses a serious public health risk. Id. ¶ 2. In

response to the virus' spread around the United States, the President of the United States

declared a national emergency on March 13, 2020. Id. ¶ 5.

According to the Centers for Disease Control and Prevention ("CDC"), COVID-19

primarily spreads via person-to-person contact and may be spread not only by those who have

symptoms, but also by those who are asymptomatic. Id. ¶ 12. Given COVID-19's infection rate,

"slowing its spread is most effectively accomplished through the implementation of density

reduction policies limiting person-to-person contact as much as possible, and the use of 'social

distancing' where other measures are not feasible." Id. ¶ 13.

#### 2. The Parties

Plaintiff Dark Storm is a limited liability corporation formed and existing under the laws

of the State of New York. Dkt. No. 18 ("Newman Declaration") ¶ 3. Dark Storm is licensed

under federal and state law to engage in the business of selling firearms and ammunition in New York, and has a principal place of business in Oakdale, New York. Id.; Dkt. No. 17 ("Morrisey Declaration") ¶ 3.

Plaintiffs Doherty and Schmucker (together, "Individual Plaintiffs") are customers who sought to purchase weapons from Dark Storm, but were unable to because, as described below, Dark Storm was forced to close in response to the COVID-19 pandemic. Compl. ¶¶ 3–4.

Defendant Cuomo is the governor of the State of New York. Id. ¶ 5.

The parties dispute the nature of Defendant ESD. Plaintiffs claim that ESD is nothing more than "a domestic business corporation." Pls.' SMF ¶ 12 (citing Dkt. No. 16-5 (records from the New York Department of State Division of Corporations stating that "Empire State Development Corporation" is a New York State "domestic business corporation")). By contrast, Defendants state, somewhat cryptically, that "'Empire State Development' is the term used to collectively describe the New York State Department of Economic Development and the New York State Urban Development Corporation."[1] Dkt. No. 24-16 ("Fine Declaration") ¶ 19.

Defendant Fine is Deputy Commissioner of the New York State Department of Economic Development ("DED") and Executive Vice President and General Counsel for the New York

---

[1]  The Court notes that, according to ESD's website, "Empire State Development is the umbrella organization for New York's two principal economic development financing entities: The New York State Urban Development Corporation and the New York Job Development Authority." About Us, EMPIRE STATE DEVELOPMENT, https://esd.ny.gov/about-us (last visited July 5, 2020); see also Leger v. Kalitta, No. 16-CV-6545, 2018 WL 2057142, at *3 (E.D.N.Y. Jan. 26, 2018) ("[T]he Court may take judicial notice of documents retrieved from official government websites or other government records from such websites.") (internal quotation marks omitted). Additionally, other courts have called ESD a "public benefit corporation," see Goldstein v. Pataki, 516 F.3d 50, 60 (2d Cir. 2008) ("ESD[] . . . is organized under state law as a public-benefit corporation."), which "exist[] independently of the State," Bordeleau v. State, 18 N.Y.3d 305, 316 (2011).

State Urban Development Corporation ("UDC"). Fine Decl. ¶ 1. DED is a New York State

agency and UDC is a public benefit corporation. Id.

### 3. New York's Response and the Executive Orders

Here in New York, as COVID-19 cases mounted, Governor Cuomo issued Executive

Order 202, pursuant to NYS Executive Law Article 2-B, § 28, in which he declared a state of

emergency effective March 7, 2020 for the entire State of New York. Defs.' SMF ¶ 6. The

Governor continued to issue executive orders—such as those temporarily closing schools and

cancelling all social gatherings—as New York's response to the virus evolved. Pls.' SMF ¶ 1;

Defs.' SMF ¶¶ 7, 14. The purpose of these executive orders was to slow the spread of COVID-19

within the State by compelling New Yorkers to stay home and preventing person-to-person

contact, because, "in a short period of time, confirmed cases of—as well as deaths caused by—

COVID-19 within the State [had] increased exponentially." Defs.' SMF ¶¶ 8, 14. To illustrate,

"on March 15, 2020, there were approximately 600 confirmed cases throughout the entire State,

and the State had just reported its first two deaths." Id. ¶ 9. By May 29, 2020, however,

"confirmed cases in the State had increased to 368,284 and the number of . . . deaths had

increased to 23,780." Id. ¶ 10.

Of all the orders issued by Governor Cuomo in response to the pandemic, most germane

to the instant case are Executive Orders 202.6 and 202.8 (together, the "Executive Orders"). In

Executive Order 202.6, issued on March 18, 2020, Governor Cuomo designated ESD as the

entity responsible for determining which businesses in New York were "essential." Pls.' SMF ¶

2; Dkt. No. 16-3 ("Executive Order 202.6"). These determinations were to be made in "the best

interest of the state." Executive Order 202.6. Relatedly, Executive Order 202.8, issued on March

20, 2020, required non-essential businesses to reduce their workforce by 100%. Pls.' SMF ¶ 3;

Dkt. No. 16-4 ("Executive Order 202.8"). Executive Order 202.8 provides that violations of the

workplace restrictions will be enforced by Public Health Law § 12, which provides for a penalty up to $2,000 and enforcement by injunctive actions brought by the New York Attorney General. Fine Decl. ¶ 14.

Following the issuance of Executive Order 202.6, ESD published guidance further defining "essential" businesses. Defs.' SMF ¶ 15. Under this guidance, "hundreds of categories of businesses" in New York—including gun shops—could not open for business. Id. ¶ 32. Examples of businesses that ESD deemed "essential" and that could open were car dealerships and realtors. Pls.' SMF ¶ 11. This was because these businesses provided "goods or services that are essential to human life such as food, beverage, shelter, healthcare, or transportation." Fine Decl. ¶ 34. Where a business was not specifically listed as essential, it could request clarification from ESD. Defs.' SMF ¶ 16.

### 4. *Dark Storm's Closure*

On March 21, 2020, after the Executive Orders were promulgated, Dark Storm's managing member, Edward Newman, Newman Decl. ¶ 2, contacted ESD to inquire whether Dark Storm's firearms business was "essential" under Executive Order 202.6. Defs.' SMF ¶ 17; Pls.' SMF ¶ 5. In response, an ESD employee sent Newman an email stating the following:

> [Y]our business has been designated as essential solely with respect to work directly related to police and/or national defense matters [that] are exempt from current restriction. Only those employees can be present at the business location in support of essential business activities. No other employees/personnel shall be permitted to work from your business's location. Any other business activities being completed at your location that are not essential are still subject to the revised Executive Order 202.6.

Pls.' SMF ¶ 5; Defs.' SMF ¶ 18. On March 21, 2020, Newman replied by email, asking, "So to be clear we may continue to conduct business with law enforcement and military but not civilians?" Newman Decl. ¶ 6; Defs.' SMF ¶ 19. On March 22, 2020, an ESD employee

responded again via email, writing, "Yes that is correct as advised by counsel." Newman Decl. ¶ 7; Defs.' SMF ¶ 20.

In response to these communications, Dark Storm closed its retail business and ceased selling guns and ammunition to the general public. Pls.' SMF ¶ 8; Morrisey Decl. ¶ 4. As a result of this closure, Dark Storm was unable to fulfill an order for a gun placed by Schmucker. Morrisey Decl. ¶ 5. Dark Storm did, however, continue manufacturing products for shipment to distributors and for sale to law enforcement and military customers. Id. ¶ 6.

Notably, other retailers that sold firearms, such as Walmart and Runnings, were classified as essential and remained open for business with the general public across New York State. Defs.' SMF ¶¶ 35–56.

### 5. New York's Reopening

In May 2020, having successfully slowed the spread of the virus, New York began "re-opening" pursuant to a four-phase plan. Defs.' SMF ¶ 21; Fine Decl. ¶ 40. In order to progress through the ongoing re-opening process, each region of the state must meet several health-related benchmarks. Defs.' SMF ¶ 21. Although the reopening plan doesn't say so explicitly, it appears to contemplate possible renewed shutdowns in the future, if regions do not meet the health-related benchmarks. See A Guide to Reopening New York & Building Back Better, NEW YORK FORWARD, 53–54 (2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/NYForwardReopeningGuide.pdf ("Once a phased reopening begins, it is essential that the rate of transmission be carefully monitored and remain under control. . . . [A] team of local elected officials, as well as hospital

and state representatives, will monitor [certain] metrics and other key indicators, and can slow or shut off reopening if indicators are problematic . . . .").[2]

Long Island, where Dark Storm's retail and manufacturing facility is located, began its phase one reopening on May 27, 2019. Id. ¶ 25. Under phase one, non-essential retailers—including firearms retailers like Dark Storm—could fulfill online orders via in-store pickup.[3] Id. ¶ 24. Currently, Long Island is in phase three of its reopening. See NEW YORK FORWARD, https://forward.ny.gov/ (last visited July 5, 2020).[4]

**B.  Procedural History**

Plaintiffs filed their Complaint on March 30, 2020. Docket. In the Complaint, Plaintiffs asserted three causes of action: (1) violations of Plaintiffs' Second Amendment rights to keep and bear arms; (2) violations of Article IV, Section 2 of the Constitution, otherwise known as the Privileges and Immunities clause; (3) violations of Plaintiffs' Fourteenth Amendment substantive due process rights. Compl. ¶¶ 29–34.

On May 12, 2020, Plaintiffs filed their motion for partial summary judgment seeking declaratory relief against ESD. Pls.' Mot. More specifically, Plaintiffs seek only "a simple

---

[2]  "[T]he Court may take judicial notice of documents [such as these] retrieved from official government websites or other government records from such websites." Leger, 2018 WL 2057142, at *3 (internal quotation marks omitted). The Court may properly consider the information contained in these documents at this stage because "any facts subject to judicial notice may be properly considered in a motion for summary judgment." Desclafani v. Pave-Mark Corp., No. 07-CV-4639, 2008 WL 3914881, at *5 n.7 (S.D.N.Y. Aug. 22, 2008).

[3]  Defendants point out that Plaintiffs requested this precise accommodation in their summary judgment materials filed on May 12, 2020, several weeks before long island's May 27, 2020 phase one reopening. See Morrisey Decl. ¶¶ 9, 14–15.

[4]  As each region's reopening status is "published by the [State] and available on a government website, the Court takes judicial notice of it." See Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio, 364 F. Supp. 3d 253, 262 (S.D.N.Y.), aff'd, 788 F. App'x 85 (2d Cir. 2019).

judicial declaration of the unconstitutionality of ESD's determination that gun stores are not

'essential' and therefore [could not] remain open for business" during the depth of New York's

COVID-19 related shutdown. Dkt. No. 16 ("Maloney Declaration) ¶ 8.

Then, on June 2, 2020, Defendants filed their opposition to Plaintiffs' Motion and their

cross-motion for summary judgment. Docket. Defendants seek dismissal of Plaintiffs' Complaint

in its entirety. Defs.' Mem. at 1.

With the filing of Plaintiffs' Reply on June 9, 2020, Docket, the instant motions were ripe

for review.

### III.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary

judgment if "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the

outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or

unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see

also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of

fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis

for the motion and identifying those portions of the record that the moving party claims will

demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party

has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.'" Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 WL 4805354, at *8 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV.   DISCUSSION

The Court addresses, in turn: (A) the justiciability of Plaintiffs' case; (B) the parties' arguments regarding whether ESD possesses sovereign immunity; (C) the merits of Plaintiffs' Second Amendment claim; (D) Plaintiffs' apparent abandonment of their Privileges and Immunities and substantive due process claims; and (E) Plaintiffs' request for declarative relief.

### A.  Justiciability

Defendants raise both standing and mootness arguments. Defs.' Mem. at 5–6. The Court first addresses standing, then mootness.

#### 1.  Standing

Defendants argue first that the Court should grant them summary judgment because the Plaintiffs lack standing to seek prospective relief. Defs.' Mem. at 5–6. The Court rejects this argument.

Article III of the Constitution requires that a plaintiff in a federal court have "standing" to assert his or her claim. See Spokeo, Inc. v. Robins, ––– U.S. ––––, 136 S. Ct. 1540, 1547 (2016). Specifically, the plaintiff must show: (1) an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable decision. Id. "An injury-in-fact must be concrete and particularized and actual or imminent, not conjectural or hypothetical." United States v. Smith, 945 F.3d 729, 736 (2d Cir. 2019) (internal quotation marks omitted). The plaintiff bears the burden of establishing standing and, at the summary judgment stage, cannot "rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts [establishing standing] . . . which for purposes of the summary judgment motion will be taken to be true." Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n, No. 14-CV-10116, 2020 WL 1285783, at *10 (S.D.N.Y. Mar. 18, 2020) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)). As part of this burden, "[a] plaintiff must demonstrate standing separately for each form of relief sought." MacIssac v. Town of Poughkeepsie, 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000)).

Relying on this last requirement of standing doctrine, Defendants assert that Plaintiffs lack standing to seek prospective relief. Defs.' Mem. at 5–6. Specifically, Defendants assert that "on May 27, 2020, Long Island began Phase One of the re-opening process, pursuant to which non-essential retailers such as Dark Storm's store are permitted to fulfill deliveries via in-store pickup." Id. at 6. For this reason, say Defendants, "[e]ven [if] the Plaintiffs were previously unable to purchase firearms, that is no longer the case." Id. As a result, according to Defendants, "Plaintiffs lack standing [to seek prospective relief] because they cannot show anything other than an alleged past injury." Id.

10

Fatal to Defendants' argument, however, is that "[t]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." Connecticut Citizens Def. League, Inc. v. Lamont, No. 20-CV-646, 2020 WL 3055983, at *5 (D. Conn. June 8, 2020) (emphasis in original) (citing Davis v. Federal Election Comm'n, 554 U.S. 724, 734 (2008)). Thus, because the Executive Orders requiring Dark Storm's shutdown were issued on March 18, 2020 and March 20, 2020, see Executive Order 202.6; Executive Order 202.8, and were in place on March 30, 2020 when this suit was filed, Docket, the May 27, 2020 relaxation of these orders associated with New York's phase one re-opening is irrelevant to the standing inquiry, see Connecticut Citizens Def. League, 2020 WL 3055983, at *5 (rejecting defendants' arguments that subsequent relaxation of COVID-related shutdown orders undermined plaintiffs' standing to bring their Second Amendment claims).

Besides this unavailing argument, Defendants make no more general challenge to Plaintiffs' standing, see Defs.' Mem. at 5–6, nor does the Court independently identify any standing issue, see MacDonald v. Safir, 206 F.3d 183, 188 (2d Cir. 2000) ("[W]e are obligated to determine whether Appellant has the requisite standing [because] . . . [t]he federal courts are under an independent obligation to examine their own jurisdiction.") (internal citations and quotation marks omitted). With regard to Individual Plaintiffs, though they have not submitted affidavits on their own behalf, there is evidence in the record that Schmucker was unable to obtain a gun from Dark Storm because of the challenged Executive Orders. Morrisey Decl. ¶ 5. This suffices to raise a triable issue of fact as to Schmucker's standing to bring suit.[5] See Altman

---

[5] A genuinely disputed issue of material fact as to Schmucker's standing is sufficient to satisfy the standing requirement as to all Plaintiffs. See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) ("It is well settled that where, as here, multiple parties seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (internal quotation marks

v. Cty. of Santa Clara, No. 20-CV-2180, 2020 WL 2850291, at \*11 (N.D. Cal. June 2, 2020) (finding that individual plaintiffs had standing where they wished to purchase firearms but could not because defendant counties' shelter-in-place orders had deemed firearms retailers non-essential); Libertarian Party of Erie Cty. v. Cuomo, 300 F. Supp. 3d 424, 436 (W.D.N.Y. 2018) (plaintiffs plausibly alleged standing where they asserted that certain government officials' enforcement of state regulations prevented them from obtaining weapons).

As for Dark Storm, the Court finds that it, too, has independently established standing. "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." Teixeira v. Cty. of Alameda, 873 F.3d 670, 678 (9th Cir. 2017) (quoting Craig v. Boren, 429 U.S. 190, 195 (1976)). Here, Dark Storm asserts that it has ceased doing business with the general public in response to the Executive Orders, Morrisey Decl. ¶ 4, and that the Executive Orders are a "detriment" to "plaintiffs and others in the exercise of a constitutional right," id. ¶ 16. Thus, Dark Storm, "as the . . . operator of a gun store, . . . has derivative standing to assert the subsidiary right to acquire arms on behalf of [its actual and] potential customers." See Teixeira, 873 F.3d at 678 (citing Carey v. Population Servs., Int'l, 431 U.S. 678, 683 (1977)); see also Ezell v. City of Chicago, 651 F.3d 684, 693 (7th Cir. 2011) (supplier of firing-range facilities had standing to challenge, on behalf of potential customers, Chicago ordinance banning firing ranges); Drummond v. Twp., 361 F. Supp. 3d 466, 480 (W.D. Pa.) ("Plaintiff[s] . . . , as would-be operators of a commercial shooting range, have standing to sue on behalf of their potential customers."), aff'd in part, vacated in part on other grounds,

---

omitted) (quoting Rumsfeld v. Forum of Acad. and Inst. Rights, Inc., 547 U.S. 47, 52 n.2 (2006)).

remanded sub nom. Drummond v. Twp. of Robinson, 784 F. App'x 82 (3d Cir. 2019); cf. Forty-Second St. Co. v. Koch, 613 F. Supp. 1416, 1422 (S.D.N.Y. 1985) (rejecting defendants' argument that movie theater companies did not have standing to assert the rights of their customers).

Thus, Plaintiffs have raised a triable issue of fact as to whether they have standing to bring this suit.

     *2.  Mootness*

Defendants next argue that Long Island's recent reopening has mooted Plaintiffs' case. Defs.' Mem. at 6. The Court disagrees.

Mootness is a constitutional limitation on the power of federal courts. Schaeffler v. United States, 696 F. App'x 542, 543 (2d Cir. 2017). The doctrine of mootness requires a court to dismiss a case "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013). "If, as a result of changed circumstances, a case that presented an actual redressable injury at the time it was filed ceases to involve such an injury, it ceases to fall within a federal court's Article III subject matter jurisdiction and must be dismissed for mootness." Janakievski v. Exec. Dir., Rochester Psychiatric Ctr., 955 F.3d 314, 319 (2d Cir. 2020). "In contrast to the burden that falls on a plaintiff to prove standing, it is the defendant who bears the burden to prove that a change of circumstances has rendered a case moot." Connecticut Citizens Def. League, 2020 WL 3055983, at *7 (citing Mhany Mgmt., Inc. v. Cty. of Nassau, 819 F.3d 581, 603 (2d Cir. 2016)).

Defendants have failed to meet their burden. In two quick paragraphs they argue that Plaintiffs' case no longer presents a live controversy because "on May 27, 2020, Long Island began Phase One of the re-opening process," which allowed "retailers such as Dark Storm's

store . . . to fulfill deliveries via in-store pickup." Defs.' Mem. at 6. Since Plaintiffs requested

"precisely th[is] relief" in their motion, Defendants assert that Long Island's reopening has

mooted Plaintiffs case. Id. However, Defendants' arguments fail to account for the voluntary

cessation doctrine.

A defendant's "voluntary cessation of challenged conduct does not ordinarily render a

case moot." Knox v. Serv. Emp. Int'l Union, Local 1000, 567 U.S. 298, 307 (2012). A voluntary

change of conduct only renders a case moot if the defendant demonstrates both that "(1) there is

no reasonable expectation that the alleged violation will recur and (2) interim relief or events

have completely and irrevocably eradicated the effects of the alleged violation." Mhany, 819

F.3d at 603. A government defendant claiming mootness on the basis of voluntary cessation

"bears the formidable burden of showing that it is absolutely clear the allegedly wrongful

behavior could not reasonably be expected to recur." Id. (quoting Friends of the Earth, 528 U.S.

at 190).

Here, there is no dispute that New York State has voluntarily relaxed the Executive

Orders' shutdown requirements—and, thus, allowed Dark Storm to reopen—as part of its phased

reopening plan. See *Moving New York Forward: Business Reopening*, EMPIRE STATE

DEVELOPMENT, https://esd.ny.gov/nyforward (last visited July 5, 2020) ("New York State will

allow non-essential businesses to reopen on a regional and industry-specific basis, as each region

meets the criteria necessary to protect public health."); Executive Order 202.34 (May 28, 2020)

(allowing Long Island to enter phase one reopening). Given this uncompelled relaxation of the

challenged orders, the voluntary cessation exception applies to Defendants' mootness argument.

See Antietam Battlefield KOA v. Hogan, No. 20-CV-1130, 2020 WL 2556496, at *5 (D. Md.

May 20, 2020) (under voluntary cessation doctrine, governor's own relaxation of COVID-related

executive order that had allegedly burdened plaintiffs' free exercise rights did not moot plaintiffs' claims). Defendants cannot meet their burden on the first step of the voluntary cessation analysis, however, because there is a reasonable expectation that New York might be forced to shut down once again. Just recently, as the U.S. reported record-breaking daily counts of new COVID-19 cases, see *Cases in the U.S.*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 5, 2020), Governor Cuomo imposed new quarantine restrictions on travelers arriving in New York from other states, see Executive Order 205 (June 24, 2020).[6] Under these extraordinary circumstances, when a second wave of COVID-19 infections could be just around the corner, it cannot "be said with assurance that there is no reasonable expectation that the alleged violation will recur." Am. Freedom Def. Initiative v. MTA, 815 F.3d 105, 109 (2d Cir. 2016); see also Nat. Res. Def. Council v. U.S. Dep't of Energy, 362 F. Supp. 3d 126, 140–41 (S.D.N.Y. 2019) (rejecting mootness argument based on voluntary cessation of challenged conduct where "[t]here [was] no question that [the defendant] is free to return to [its] old ways").

Moreover, New York's reopening plan appears to contemplate just such a renewed shutdown. See *A Guide to Reopening New York* at 53–54 ("Once a phased reopening begins, it is essential that the rate of transmission be carefully monitored and remain under control. . . . [A] team of local elected officials, as well as hospital and state representatives, will monitor [certain] metrics and other key indicators, and can slow or shut off reopening if indicators are problematic."). And Defendants have made no commitment that they will not reinstate the shutdown orders should COVID-19 spread increase yet again. See Ciaramella v. Zucker, No. 18-

---

[6]  As described above, the Court can take judicial notice of these facts found on official government websites. See Leger, 2018 WL 2057142, at *3.

CV-6945, 2019 WL 4805553, at *4–6 (S.D.N.Y. Sept. 30, 2019) ("Without an unequivocal commitment that it does not intend to reinstate the [challenged] policy, [the defendant] cannot have met its formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not be reasonably expected to occur.") (internal quotation marks omitted).

In light of New York's reopening plan, and given the lack of public commitment by Defendants not to reinstate the shutdown orders, "[t]here are simply too many questions . . . for [the Court] to conclude that it is absolutely clear that the parties will not resume the challenged conduct." See Mhany, 819 F.3d at 604 (internal quotation marks omitted). Plaintiffs' claims are, therefore, not moot. See City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982) (municipality's "repeal of the objectionable language" of an ordinance did not moot a case where nothing "preclude[ed] [the municipality] from reenacting precisely the same provision").

**B. Sovereign Immunity**

The parties contest whether Plaintiffs' claim against ESD is barred by the Eleventh Amendment. Their arguments raise particularly tricky issues of sovereign immunity and whether Plaintiffs have named the proper defendant in this lawsuit. However, because the Court grants Defendants' Motion on other grounds, it need not resolve these issues at this time.[7] Therefore,

---

[7] The Court can sidestep the sovereign immunity issue because, "[w]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power, and therefore can be raised at any stage of the proceedings, . . . it is not coextensive with the limitations on judicial power in Article III." Calderon v. Ashmus, 523 U.S. 740, 745 n.2 (1998). Similarly, "sovereign immunity [is more like] an affirmative defense than . . . a jurisdictional bar." Warburton v. John Jay Coll. of Criminal Justice of City Univ. of New York, No. 14-CV-9170, 2015 WL 3948107, at *3 (S.D.N.Y. June 29, 2015) (quoting Carver v. Nassau Cty. Interim Fin. Auth., 730 F.3d 150, 156 (2d Cir. 2013)). Thus, the Court is not required to resolve the sovereign immunity issue prior to turning to the merits of the parties' motions, unlike, say, standing, mootness, or other issues that bear on the Court's subject matter jurisdiction. See Thomas v. Butkiewicus, No. 13-CV-747, 2013 WL 12303036, at *1 (D. Conn. Dec. 20, 2013) (declining to hold that "Eleventh Amendment immunity is a true issue of subject matter jurisdiction").

for the purposes of the remainder of this opinion, the Court assumes—without deciding—that Plaintiffs have raised a triable issue of fact as to whether ESD was ultimately responsible for issuing the Executive Orders and whether ESD is protected by New York State's sovereign immunity.

### C.  Second Amendment

The parties each move for summary judgment on the issue of whether the Executive Orders violate Plaintiffs' Second Amendment rights. After considering the undisputed facts, the Court grants Defendants' summary judgment motion and denies Plaintiffs'.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," D.C. v. Heller, 554 U.S. 570, 592 (2008), and applies to the states as well as the Federal Government, McDonald v. City of Chicago, Ill., 561 U.S. 742, 791 (2010). However, "the right secured by the Second Amendment is not unlimited," and it allows some space for "laws imposing conditions and qualifications on the commercial sale of arms." Heller, 554 U.S. at 626–27. Additionally, the Supreme Court has not "delineated the precise scope of the Second Amendment or the standards by which lower courts should assess the constitutionality of firearms restrictions." New York State Rifle & Pistol Ass'n, Inc. v. City of New York (NYSRPA v. NYC), 883 F.3d 45, 55 (2d Cir. 2018), vacated on other grounds and remanded sub nom. New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York, 140 S. Ct. 1525 (2020).

The Second Circuit has adopted a two-step inquiry for determining the constitutionality of firearm restrictions:

> First, [the court] consider[s] whether the restriction burdens conduct protected by the Second Amendment. If the challenged restriction does

> not implicate conduct within the scope of the Second Amendment, [the] analysis ends and the legislation stands. Otherwise, [the court] move[s] to the second step of [the] inquiry, in which [it] must determine and apply the appropriate level of scrutiny.

New York State Rifle & Pistol Ass'n, Inc. v. Cuomo (NYSRPA v. Cuomo), 804 F.3d 242, 254 (2d Cir. 2015).

For the purposes of resolving the instant motions, the Court assumes—without deciding—that Plaintiffs have raised a triable issue of fact as to whether the Executive Orders burden conduct protected by the Second Amendment. See United States v. Jimenez, 895 F.3d 228, 234 (2d Cir. 2018) (assuming without deciding that step one of the Second Amendment inquiry was satisfied and proceeding directly to step two). The Court therefore turns to step two of the analysis where it determines that the Executive Orders do not substantially burden Plaintiffs' Second Amendment rights and, in any event, survive intermediate scrutiny.

### 1. The Appropriate Level of Scrutiny

Plaintiffs assert that the Executive Orders "go[] even further than the ban at issue in Heller [by] mak[ing] any and all legal acquisition of firearms and ammunition impossible,"[8] Pls.' Mem. at 9; Pls.' Reply at 4, and appear to argue for some sort of rule of per se unconstitutionality under these circumstances, Pls.' Mem. at 10 (asserting that "ESD's determination . . . is violative of the Second Amendment" and failing to argue for any form of heightened scrutiny). But such an approach does not comport with precedent in the Second Circuit. See Sibley v. Watches, No. 19-CV-6517, 2020 WL 2525771, at *7 (W.D.N.Y. May 18, 2020) ("The Second Circuit and district courts in this Circuit have continually chosen to apply intermediate scrutiny to general challenges under the Second Amendment.") (internal quotation marks omitted); Doe No. 1 v.

---

[8]  This statement of fact is incorrect, as related above and described, in greater detail, below.

18

Putnam Cty., 344 F. Supp. 3d 518, 538 n.12 (S.D.N.Y. 2018) ("[T]he Second Circuit has not yet

applied [strict] scrutiny to any statute in the Second Amendment context . . . ."). For their part,

Defendants argue that, at most, intermediate scrutiny should apply. Defs' Mem. at 14–15. The

Court agrees with Defendants that, at most, intermediate scrutiny is warranted here.

 When determining whether some form of heightened scrutiny applies, a court must

consider: (1) "how close the law comes to the core of the Second Amendment right"; and (2)

"the severity of the law's burden on the right." NYSRPA v. Cuomo, 804 F.3d at 254. Because of

the "opaqueness" of the law surrounding "conditions and qualifications on the commercial sale

of arms," the Court assumes without deciding that the burden imposed by the Executive Orders

comes close to the core of the Second Amendment right.[9] Pena v. Lindley, 898 F.3d 969, 976–77

(9th Cir. 2018) (declining to "answer conclusively whether [certain] restrictions implicate the

core Second Amendment right of 'self defense of the home,' . . . [b]ecause the restrictions do

not substantially burden any such right").

 Turning to the second factor, "heightened scrutiny is appropriate only where the law

'substantially burdens' Second Amendment protections." Libertarian Party, 300 F. Supp. 3d at

442 (quoting NYSRPA v. Cuomo, 804 F.3d at 259); see also NYSRPA v. Cuomo, 804 F.3d at

254 ("Laws that neither implicate the core protections of the Second Amendment nor

substantially burden their exercise do not receive heightened scrutiny."). Crucially, "[n]o

'substantial burden' exists—and hence heightened scrutiny is not triggered—'if adequate

---

 [9] Such an assumption may be reasonable. The core of the Second Amendment right is
the ability to "protect[] oneself in one's home with a weapon in common use." Jimenez, 895 F.3d
at 234; see also NYSRPA v. NYC, 883 F.3d at 56 ("[A] statute can implicate the core of the
Second Amendment's protections by extending into the home, where the need for defense of
self, family and property is most acute.") (internal quotation marks omitted). Here, because the
regulations at issue potentially impact an individual's ability to procure a weapon for the defense
of her or his home, they could implicate the core of the Second Amendment right.

alternatives remain for law-abiding citizens to acquire a firearm for self-defense.'" Id. at 259

(quoting United States v. Decastro, 682 F.3d 160, 168 (2d Cir. 2012)); see also Libertarian Party,

300 F. Supp. 3d at 442 ("[W]here a law does not prevent law-abiding, responsible citizens from

possessing firearms 'in defense of hearth and home,' it does not substantially burden the core

Second Amendment right.") (quoting Aron v. Becker, 48 F. Supp. 3d 347, 371 (N.D.N.Y.

2014)).

     Here, there appears to be no dispute that alternatives remained for Plaintiffs and others

like them in New York to acquire firearms for self-defense. As Defendants point out, even in the

depths of the shutdown, when Dark Storm was unable to do business with the general public,

Morrisey Decl. ¶ 4, other stores that stock firearms such as Walmart and Runnings remained

open around New York State, Defs.' SMF ¶¶ 35–56 (documenting over twenty Walmart and

Runnings locations in New York that sold firearms and were open during the shutdown).[10]

Indeed, a quick google search indicates that three of these stores are within a half hour's drive of

Oakdale, New York, where Dark Storm is located. See Dkt. No. 24-56 ("Metz Declaration")

(stating that firearms and ammunition were available for sale at the Walmart in each of

Centereach, Nesconset, and Islandia, New York); see also GOOGLEMAPS,

---

     [10]  To support this point, Defendants submitted affidavits from several investigators
employed by the New York Attorney General's office. See Dkt. Nos. 24-55 to -64. These
investigators work in different locations around New York State and apparently visited nearby
Walmart and Runnings stores to check if they were open and selling firearms during the
shutdown. Id. The Court notes these points only to emphasize that the twenty-two stores cited by
Defendants do not appear to be a comprehensive list of retailers selling firearms during New
York's shutdown. Instead, it seems likely that numerous other Walmart and Runnings locations
unvisited by the AG investigators remained opened to sell firearms during the shutdown. See
Location Facts – New York, WALMART, https://corporate.walmart.com/our-
story/locations/united-states/new-york (last visited July 5, 2020) (stating that Walmart owns and
operates 110 retail stores in New York state).

http://maps.google.com (last visited July 5, 2012) (indicating that the Walmart stores in

Centereach, Nesconset, and Islandia, New York are all within a half hour's drive from Oakdale,

New York); Rindfleisch v. Gentiva Health Sys., Inc., 752 F. Supp. 2d 246, 259 n.13 (E.D.N.Y.

2010) (calculating distances and transportation times using googlemaps and stating that "[c]ourts

commonly use internet mapping tools to take judicial notice of distance and geography").[11]

These alternatives are adequate under existing precedent. See Decastro, 682 F.3d at 168 (law that

prohibited the transportation into a person's state of residence firearms acquired outside the state

was not subject to heightened scrutiny because "it d[id] nothing to keep someone from

purchasing a firearm in her home state," and thus provided ample alternative means of acquiring

firearms for self-defense purposes); Teixeira, 873 F.3d at 680 ("[G]un buyers have no right to

have a gun store in a particular location, at least as long as their access is not meaningfully

constrained."); Pena, 898 F.3d at 979 (finding a burden to not be substantial where "[t]here [was]

no evidence in the record that the hundreds of [alternative] firearms available for purchase are

inadequate for self-defense."); Second Amendment Arms v. City of Chicago, 135 F. Supp. 3d

743, 754 (N.D. Ill. 2015) ("[A] slight diversion off the beaten path is no affront to . . . Second

Amendment rights."); cf. Kwong v. Bloomberg, 723 F.3d 160, 167–68 (2d Cir. 2013) ("[T]he

fact that the [challenged regulation] makes the exercise of one's Second Amendment rights more

expensive does not necessarily mean that it 'substantially burdens' that right.").

---

[11]   Further, there is at least some circumstantial evidence that guns were, in fact, being purchased in New York in the relevant period. Statistics published by the FBI indicate that 27,035 firearm-related background checks were performed in New York State in April 2020, while the state was shut down. See Dkt. No. 24-12 ("NICS Statistics"). While the FBI cautions that such a number "do[es] not represent the number of firearms sold," id., these statistics undermine Plaintiffs' assertion that "persons throughout the state were . . . wholly unable to purchase firearms or ammunition" during the shutdown, Pls.' Reply at 4. To credit Plaintiffs' assertion would mean that these 27,035 background checks resulted in zero gun sales, a fact which would strain credulity.

In rebuttal, Plaintiffs assert that "all businesses selling firearms were affected by ESD's decision," Pls.' Reply at 4, but they offer no evidence to controvert Defendants' evidence that numerous businesses selling firearms remained open during the shutdown. Nor have Plaintiffs supported their charge that, during the shutdown, "persons throughout the state were . . . wholly unable to purchase firearms or ammunition." Id. (citing to no record evidence to support assertion). All Plaintiffs offer in response to Defendants' evidence that adequate alternatives to purchasing guns from Dark Storm existed is a denial "that such facts are material." See Pls.' Resp. to Defs.' SMF. Yet such a denial fails to account for Second Circuit precedent, which is clear that "[n]o substantial burden exists . . . if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." NYSRPA v. Cuomo, 804 F.3d at 259; see also Decastro, 682 F.3d at 168.

"[W]here the burden imposed by a regulation on firearms is a 'marginal, incremental or even appreciable restraint on the right to keep and bear arms,'" or, in other words, insubstantial, the Second Circuit has said that "it will not be subject to heightened scrutiny." Kwong, 723 F.3d at 167 (quoting Decastro, 682 F.3d at 166). Therefore, having found that the burden on Plaintiffs' Second Amendment rights is insubstantial, the Court has no need to apply any form of heightened scrutiny to the Executive Orders.

However, the Second Circuit has also said that "laws that place . . . insubstantial burdens on conduct at the core of the Second Amendment . . . can be examined using intermediate scrutiny." Jimenez, 895 F.3d at 234. In accordance with Jimenez, and having assumed that the Executive Orders burden conduct near the core of the Second Amendment right, the Court in an abundance of caution applies intermediate scrutiny to the challenged regulations. See Sibley, 2020 WL 2525771, at *7 ("The Second Circuit and district courts in this Circuit have continually

chosen to apply intermediate scrutiny to general challenges under the Second Amendment.")
(internal quotation marks omitted) (citing cases).

### 2.  Intermediate Scrutiny Applied

"To withstand intermediate scrutiny, a law must generally be substantially related to the
achievement of an important governmental interest." Jimenez, 895 F.3d at 236 (internal
quotation marks omitted). "To survive intermediate scrutiny, the defendant[] must show
'*reasonable* inferences based on *substantial* evidence' that the statute[] [is] substantially related
to the governmental interest." NYSRPA v. Cuomo, 804 F.3d at 264 (emphasis in original)
(quoting Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997)).

The Court first assesses whether the governmental interests at stake here are important.
There is no dispute that the Executive Orders were issued to combat the spread of COVID-19.
See Pls.' SMF ¶ 1 ("In response to the ongoing Coronavirus (COVID-19) pandemic, the
Governor of the State of New York has issued a series of Executive Orders, [including the orders
at issue in this case]"); Defs.' Resp. to Pls.' SMF ¶ 1 (not disputing the statement in the previous
citation); Defs.' SMF ¶ 8 ("The purpose of the Executive Orders is to slow the spread and
manage the impact of COVID-19 within the State, because, in a short period of time, confirmed
cases of—as well as  deaths  caused  by—COVID-19 within the State increased exponentially.");
Pls.' Resp. to Defs.' SMF (not disputing the statement in the previous citation). There also
appears to be no dispute that preventing the spread of COVID-19 is an important governmental
interest.[12] See Defs.' Mem. at 16 (arguing that "stopping the spread of this deadly virus is an

---

[12]  A few numbers illustrate the scope of the epidemic. "On March 15, 2020, there were
approximately 600 confirmed cases throughout [New York] State, and the State had just reported
its first two deaths. . . . As of May 29, 2020, confirmed cases in the State had increased to
368,284 and the number of State deaths had increased to 23,780." See Defs.' SMF ¶¶ 9–10.

important governmental interest"); Pls.' Mem. (failing to contest that slowing the spread of

COVID-19 is an important governmental interest); Pls.' Reply (same). Thus, Defendants have

shown that there is no triable issue of fact as to this first requisite of the Executive Orders

surviving intermediate scrutiny. See Altman, 2020 WL 2850291, at *15 (regulations requiring

the closure of "non-essential" firearms dealers survive intermediate scrutiny in part because

"preventing the spread of a [the COVID-19] pandemic [was] a 'significant, substantial, or

important' government interest"); Connecticut Citizens Def. League, 2020 WL 3055983, at *11

(applying intermediate scrutiny to emergency measures in Connecticut that affected the ability of

the plaintiffs to procure firearms and determining that "there is no doubt that the [defendants]

have a compellingly important government interest: protection of law enforcement personnel,

permit applicants, and Connecticut residents generally from infection by the COVID-19 virus");

Kwong, 723 F.3d at 168 ("New York has [a] substantial, indeed compelling, governmental

interest[] in public safety . . . .").

        The Court next asks whether the Executive Orders were substantially related to the goal

of curbing the transmission of COVID-19 and finds that there is no triable issue of fact as to

whether they were. Indeed, the undisputed record indicates that, "in formulating [their]

judgments [regarding the Executive Orders], [Defendants] ha[ve] drawn reasonable inferences

based on substantial evidence," which is sufficient to survive intermediate scrutiny. See

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 97 (2d Cir. 2012) (citing Turner, 520 U.S. at

195). To begin, neither party contests the basic science:

            According to the Centers for Disease Control, COVID-19 primarily
            spreads via person-to-person contact and may be spread not only by
            those who have symptoms, but also by those who are asymptomatic.
            Given the infection rate of COVID-19, slowing its spread is most
            effectively accomplished through the implementation of density
            reduction policies limiting person-to-person contact as much as

24

possible, and the use of "social distancing" where other measures are
not feasible.

Defs.' SMF ¶¶ 12–13; Pls.' Resp. to Defs.' SMF.

The undisputed record further indicates that Defendants crafted New York's response to
the pandemic based on this science. As Defendants describe, "[t]he Executive Orders are
designed to curb transmission [of COVID-19] by promoting social distancing." Defs.' Mem. at
16 (citing Dkt. No. 24-31 ("Hutton Declaration") ¶¶ 12–17); see also Defs.' SMF ¶ 30. They
accomplish this by requiring all but the most essential businesses to close or operate remotely,
see id. ¶ 14 ("[A]mong other measures aimed at compelling New Yorkers to stay home and
prevent person-to-person contact . . . Governor Cuomo issued Executive Orders restricting the
operations of 'non-essential' businesses while allowing for the continued operation of 'essential'
businesses."), which "slows the spread of the virus by limiting physical interaction and . . . the
risk of exposure," id. ¶ 33. Plaintiffs dispute none of these facts. See Pls.' Resp. to Defs.' SMF.
And these facts constitute "evidence that fairly supports [Defendants'] rationale." NYSRPA v.
Cuomo, 804 F.3d at 261 (alterations and citations omitted). So supported, the Executive Orders
survive intermediate scrutiny. See id.

Additionally, a comparison of the means-ends fit here with the fit in other cases in which
the Second Circuit has rejected Second Amendment challenges to government regulations
further emphasizes that the Executive Orders survive intermediate scrutiny. For example, in
NYSRPA v. Cuomo, the Second Circuit held that prohibitions against assault weapons and large
capacity magazines survived intermediate scrutiny, because they were substantially related to the
state's interest in controlling crime. 804 F.3d at 261–64. Likewise, in Kachalsky, the Second
Circuit held that New York's interest in public safety was substantially related to a regulation
limiting handgun possession in public. 701 F.3d 81, 93–101. Yet the fit in this case between the

25

means—the Executive Orders—and the ends—slowing the spread of COVID-19—is even closer than the fits upheld in <u>NYSRPA</u> and <u>Kachalsky</u>. "While the [challenged] regulations" in those cases "affected some number of people who did not actually pose the danger the regulations were intended to abate,"—i.e., those who are not criminals or pose no public safety risk—"here, every resident of [New York] is a potential vector for COVID-19." <u>See</u> <u>Altman</u>, 2020 WL 2850291, at *17. Indeed, Defendants have submitted evidence that "[l]imiting face-to-face contact with others is the best way to reduce the spread of COVID-19," and that by reducing "contact with infected people and contaminated surfaces," social distancing has "slow[ed] [the virus'] spread." Hutton Decl. ¶ 14; <u>see also</u> Defs.' SMF ¶ 34 ("It is now clear that avoiding unnecessary personal interaction has "flattened the curve," and potentially saved an untold number of lives.").[13] Under such circumstances, measures such as the Executive Orders that seek to reduce the face-to-face interactions of all New Yorkers fit tightly with the State's goal of slowing the spread of the disease,[14] and thus survive intermediate scrutiny.

---

[13] Plaintiffs assert that "the clarity of the cause and effect" between Defendants' decisions and a reduction in the spread of the disease is not "established," as "the data at this point" is "insufficient to draw such a sweeping conclusion." Pls.' Resp. to Defs.' SMF. But the Court notes that Plaintiffs have neither cited to nor submitted any evidence discounting the effectiveness of social distancing measures or cautioning that their effectiveness cannot be known at this early stage. An unsupported argument or factual denial is typically insufficient to defend against a motion for summary judgment. Additionally, while Plaintiffs are doubtless correct that it will be some time before scientists, researchers, and courts can establish with precision the efficacy of different social distancing and other preventative measures, Defendants do not need to conclusively prove causation for the Executive Orders to survive intermediate scrutiny. <u>See</u> <u>Kwong v. Bloomberg</u>, 876 F. Supp. 2d 246, 259 (S.D.N.Y. 2012) ("Courts applying intermediate scrutiny in the Second Amendment context have concluded that the asserted governmental objective must be substantial or important and that there must be a reasonable, but not perfect, fit between the challenged regulation and the asserted objective."), <u>aff'd</u>, 723 F.3d 160 (2d Cir. 2013).

[14] A corollary of this is that any exception to social distancing measures like the Executive Orders necessarily reduces the effectiveness of those measures. Such a corollary

The Court's conclusion accords with those of other courts that have considered similar regulations during this pandemic. See Altman, 2020 WL 2850291, at *1–4 (finding that Alameda County's shelter-in-place order, which ordered closed firearms retailers and shooting ranges as non-essential businesses, survived intermediate scrutiny because defendants had "demonstrated a reasonable fit between the burden the Order places on Second Amendment rights and Defendants' goal of reducing COVID-19 transmission"); McDougall v. Cty. of Ventura California, No. 20-CV-2927, 2020 WL 2078246, at *1 (C.D. Cal. Apr. 1, 2020) (denying request for injunctive relief because plaintiff's Second Amendment challenge to county order closing gun shops was not likely to succeed on the merits); Brandy v. Villanueva, No. 20-CV-2874, Dkt. No. 29, at 5–6 (C.D. Cal. Apr. 6, 2020) (declining to enjoin similar regulations and reasoning that, "[b]ecause [COVID-19] spreads where [a]n infected person coughs, sneezes, or otherwise expels aerosolized droplets containing the virus, the closure of non-essential businesses, including firearms and ammunition retailers, reasonably fits the [defendants'] stated objectives of reducing the spread of this disease").

On the issue of fit, Plaintiffs have two responses. First, allowing Dark Storm to remain open for business with police and the military, while prohibiting "any and all transactions with the public," "does not rationally, equitably, or constitutionally advance the goal of limiting the transmission of Coronavirus, and, as a practical matter, makes no sense," Morrisey Decl. ¶¶ 13, 17. And second, "[t]here is no good reason" why realtors and auto dealers should be allowed to do business with the public but "the same should not be permitted for firearms dealers," id. ¶ 14. Plaintiffs appear, then, to argue that the Executive Orders are not sufficiently tailored to

---

undermines Plaintiffs' suggestion that the Executive Orders are "irrational" and that "there is no good reason why" firearms dealers should not be granted an exception. Morrisey Decl. ¶¶ 13–14.

achieving their stated goal of slowing the spread of COVID-19. But this argument fails because Plaintiffs misapprehend the intermediate scrutiny analysis. Intermediate scrutiny, "unlike strict scrutiny," does "not require[]" that a given government action be "'narrowly tailored' or the least restrictive available means to serve the stated governmental interest." Kachalsky, 701 F.3d at 97. Instead, "the fit between the challenged regulation [and the government ends] need only be substantial, not perfect." Id. (internal quotation marks omitted); see also Doe No. 1, 344 F. Supp. 3d at 538 ("Courts applying intermediate scrutiny in the Second Amendment context have concluded that the asserted governmental objective must be substantial or important and that there must be a reasonable, but not perfect, fit between the challenged regulation and the asserted objective."). And as explained above, and as confirmed by other courts that have considered similar regulations, the fit between the Executive Orders and the State's interest in protecting public health amply satisfies the requirements of intermediate scrutiny.

Additionally, even if the Executive Orders were subject to more stringent "fit" requirements, the Court is unconvinced by Plaintiffs' specific arguments on this issue. Allowing Dark Storm to remain open to service only police and military clients necessarily reduces person-to-person interactions—and, concomitantly, the risk of spread—below what they would otherwise be if Dark Storm were also permitted to do business with the general public. The Court sees nothing "irrational," Morrisey Decl. ¶ 13, in this decision, which seeks to minimize opportunities for the disease to spread while making a policy judgment that certain limited exceptions are warranted, see Fine Decl. ¶¶ 34–39 (describing how exceptions to the Executive Orders were allowed for providers of services that were "essential to human life[,] such as food, beverage, shelter, healthcare, or transportation"). Similarly, with regard to realtors and auto dealers, the record indicates that Defendants exempted those businesses from the shutdown

orders in order to ensure that New Yorkers retained the ability to secure housing and

transportation. Id. ¶¶ 37–38. To be sure, Defendants might have made the same decision with

respect to firearms retailers like Dark Storm, and might have been justified in doing so. But to

say that "[t]here is no good reason" for Defendants not to exempt Dark Storm and businesses like

it from the Executive Orders in the same way that certain other businesses were exempted is to

ignore the evidence that the more businesses open and, thus, the more opportunities for people to

interact, the greater the risk of spread of the disease. See Martinez-Brooks v. Easter, No. 20-CV-

569, 2020 WL 2405350, at *21 (D. Conn. May 12, 2020) (describing how "[l]imiting face-to-

face contact with others is the best way to reduce the spread of [COVID-19]") (citing *Social

Distancing*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-

distancing.html).

　　　　In essence, Defendants made a policy decision about which businesses qualified as

"essential" and which did not. In the face of a global pandemic, the Court is loath to second-

guess those policy decisions. See S. Bay United Pentecostal Church v Newsom, 140 S. Ct. 1613,

1613 (2020) (Roberts, C.J., concurring) ("Our Constitution principally entrusts the safety and the

health of the people to the politically accountable officials of the States to guard and protect.

When those officials undertake to act in areas fraught with medical and scientific uncertainties,

their latitude must be especially broad.") (internal citations, alterations, and quotation marks

omitted); Connecticut Citizens Def. League, 2020 WL 3055983, at *11 ("[C]ourts owe great

deference to the protective measures ordered by government officials in response to the COVID-

19 crisis, not simply because the virus has lethal consequences but also because the virus acts in

unknown ways that engender uncertainty about what scope of protective measures are

warranted."). This is especially the case where, as here, Plaintiffs have not argued that the

challenged regulation are anything but facially neutral, and there is no evidence in the record that Defendants sought to single out firearms dealers or target Second Amendment (or any other) rights. See Altman, 2020 WL 2850291, at *1 (finding that the challenged "shelter-in-place order passe[d] constitutional muster" in part because it was "facially neutral and [did] not target firearms retailers or shooting ranges in particular").

The Supreme Court's decision in Jacobson v. Massachusetts, 197 U.S. 11 (1905), in which the Supreme Court upheld a mandatory vaccination law imposed by the Cambridge, Massachusetts board of health during the midst of a smallpox epidemic, provides further support for the Court's decision not to second-guess even-handed actions by New York's government to combat the spread of the pandemic. Jacobson rejected a due process challenge to the mandatory vaccination law, reasoning that because the smallpox epidemic was "prevalent and increasing" in Cambridge, and because the law was "applicable equally to all in like condition," the law was not "in palpable conflict with the Constitution." Id. at 29–31. In doing so, the court affirmed a "community['s] . . . right to protect itself against an epidemic of disease which threatens the safety of its members" and warned against the judiciary "usurp[ing] the functions" and decisions of that community's elected branches of government," id. at 27–28; see also id. at 30 ("It is no part of the function of a court . . . to determine which . . . mode[] [of response] was likely to be the most effective for the protection of the public against disease."), even to the extent of allowing compelled vaccination on pain of criminal prosecution. If Jacobson is still good law— and it is, see S. Bay United Pentecostal Church, 140 S. Ct. at 1613—the Court is hard pressed to find that orders mandating the closure of businesses in a facially-neutral manner do not pass constitutional muster. And indeed, other courts have recently relied on Jacobson in the course of upholding other states' shutdown orders, even where those orders burdened constitutional rights.

See Legacy Church, Inc. v. Kunkel, No. 20-CV-327, 2020 WL 1905586, at *40 (D.N.M. Apr.

17, 2020) (citing Jacobson and stating that "the Court is not in a position to second-guess expert

decisions on which restrictions will be most effective at saving lives during an epidemic when

those restrictions are based not on suppression of religion but suppression of an epidemic");

Carter v. Kemp, No. 20-CV-1517, Dkt. No. 35, at 31 (N.D. Ga. April 20, 2020) (rejecting

Second Amendment claim and citing Jacobson for the proposition that "the liberty secured by the

Constitution . . . does not import an absolute right in each person to be, at all times and in all

circumstances, wholly freed from restraint . . . [t]here are manifold restraints to which every

person is necessarily subject for the common good").

To the extent Plaintiffs respond to any of this case law, their response appears to be that

the Executive Orders simply go too far. Plaintiffs assert that Heller has "take[n] certain policy

choices off the table," Pls.' Mem. at 9 (citing Heller, 554 U.S. at 616, 636), including the policy

choices implemented in the Executive Orders, which "go[] even further than the ban at issue in

Heller . . . [by] mak[ing] any and all legal acquisition of firearms and ammunition impossible,"

id. Were such an argument accurate on the facts, this might be a different case. See Illinois Ass'n

of Firearms Retailers v. City of Chicago, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) (stating that

the Second Amendment must encompass "the right to acquire a firearm, although that acquisition

right is far from absolute"); Connecticut Citizens Def. League, 2020 WL 3055983, at *12

(holding that an ongoing "ban on the collection of fingerprints" did not survive intermediate

scrutiny in light of improving COVID-19 conditions because it "categorically foreclose[d] a

person who does not already have a permit or certification from acquiring a handgun"). But it is

not. As described above, the evidence in the record indicates that, even during the height of the

lockdown, New Yorkers continued to enjoy access to numerous retailers where they could

purchase firearms. Though Plaintiffs assert that "all businesses selling firearms were affected by" the Executive Orders, Pls.' Reply at 4, it is more accurate to say that all businesses selling *exclusively* firearms were affected by Defendants' closure orders.[15] Such a distinction undermines Plaintiffs' argument that the Executive Orders spread too broadly, an argument that the Court rejects in any event, for the reasons described above. See also Teixeira, 873 F.3d at 680 n.13 ("No case supports [the plaintiff's] suggestion that the Second Amendment not only encompasses a right to acquire firearms but guarantees a certain type of retail experience.").

Therefore, the Court finds that Plaintiffs have failed to raise a triable issue of fact as to whether the Executive Orders are invalid under intermediate scrutiny. Consequently, the Court denies Plaintiffs' summary judgment motion as to the Second Amendment claim and grants Defendants' motion as to the same.

### D. Privileges and Immunities and Substantive Due Process

In their Complaint, Plaintiffs also assert claims under the Privileges and Immunities Clause of Article IV, Section 2 of the Constitution, and under the Fourteenth Amendment's Due Process clause. Compl. ¶¶ 31–34. Defendants argue for dismissal of these claims in their summary judgment motion. Defs.' Mem. at 19–21. Because Plaintiffs make no response to these

---

[15] In light of the undisputed record evidence that firearms remained for sale in New York state during the period in which the Executive Orders precluded Dark Storm from transacting business with the general public, Dark Storm's complaint seems to be less about protecting the rights of New Yorkers to acquire weapons and more about protecting its own right to sell guns. But "the Second Amendment does not independently protect a proprietor's right to sell firearms." Teixeira, 873 F.3d at 690; see also United States v. Chafin, 423 F. App'x 342, 344 (4th Cir. 2011) ("[W]e have found [no authority] that remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to sell a firearm."); Montana Shooting Sports Ass'n v. Holder, No. 09-CV-147, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010) ("Heller said nothing about extending Second Amendment protection to firearm manufacturers or dealers. If anything, Heller recognized that firearms manufacturers and dealers are properly subject to regulation . . . ."), report and recommendation adopted by 2010 WL 3909431 (D. Mont. Sept. 29, 2010).

portions of Defendants' Motion, see Pls.' Reply, the Court finds that Plaintiffs have abandoned

these claims, see Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, 143 (2d Cir.

2016) ("[A] partial response [by the non-movant] arguing that summary judgment should be

denied as to some claims while not mentioning others may be deemed an abandonment of the

unmentioned claims.") (alterations in original). Consequently, the Court grants summary

judgment to Defendants as to Plaintiffs' privileges and immunities and substantive due process

claims.

### E.  Declaratory Judgment

Since the Court enters summary judgment against Plaintiffs with regard to each of their

substantive claims, Plaintiffs' request for declaratory relief also fails. See Spiteri v. Russo, No.

12-CV-2780, 2013 WL 4806960, at *19 n.30 (E.D.N.Y. Sept. 7, 2013) ("A plaintiff cannot

maintain a claim for a declaratory judgment where the underlying substantive claim has been

dismissed since the Declaratory Judgment Act . . . only created a procedural mechanism and not

an independent cause of action.").

### V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiffs' motion for partial summary judgment (Dkt. No. 13) is

**DENIED in its entirety**; and it is further

**ORDERED**, that Defendants' cross-motion for summary judgment (Dkt. No. 24) is

**GRANTED in its entirety**; and it is further

**ORDERED**, that Plaintiffs' Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk close this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Decision and Order on all parties in

accordance with the Local Rules.

33

**IT IS SO ORDERED.**

DATED:     July 08, 2020
             Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge